Justice SOTOMAYORdelivered the opinion of the Court.
Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. § 2000e et seq., prohibits employers from discriminating on the basis of race, color, religion, sex, or national origin, or retaliating against their employees for opposing *1774 or seeking relief from such discrimination. Before a federal civil servant can sue his employer for violating Title VII, he must, among other things, "initiate contact" with an Equal Employment Opportunity counselor at his agency "within 45 days of the date of the matter alleged to be discriminatory." 29 CFR § 1614.105(a)(1) (2015).
If an employee claims he has been fired for discriminatory reasons, the "matter alleged to be discriminatory" includes the discharge itself and the 45-day limitations period begins running only after the employee is fired.
We address here when the limitations period begins to run for an employee who was not fired, but resigns in the face of intolerable discrimination-a "constructive" discharge. We hold that, in such circumstances, the "matter alleged to be discriminatory" includes the employee's resignation, and that the 45-day clock for a constructive discharge begins running only after the employee resigns.
I
We recite the following facts in the light most favorable to petitioner Marvin Green, against whom the District Court entered summary judgment. Green is a black man who worked for the Postal Service for 35 years. In 2008, he was serving as the postmaster for Englewood, Colorado when he applied for a promotion to the vacant postmaster position in nearby Boulder. He was passed over. Shortly thereafter, Green complained he was denied the promotion because of his race.
Green's relations with his supervisors crumbled following his complaint. Tensions peaked on December 11, 2009, when two of Green's supervisors accused him of intentionally delaying the mail-a criminal offense. See 18 U.S.C. § 1703. They informed Green that the Postal Service's Office of the Inspector General (OIG) was investigating the charge and that OIG agents had arrived to interview him as part of their investigation. After Green met with the OIG agents, his supervisors gave him a letter reassigning him to off-duty status until the matter was resolved. Even though the OIG agents reported to Green's supervisors that no further investigation was warranted, the supervisors continued to represent to Green that "the OIG is all over this" and that the "criminal" charge "could be a life changer." App. 53.
On December 16, 2009, Green and the Postal Service signed an agreement whose meaning remains disputed. Relevant here, the Postal Service promised not to pursue criminal charges in exchange for Green's promise to leave his post in Englewood. The agreement also apparently gave Green a choice: effective March 31, 2010, he could either retire or report for duty in Wamsutter, Wyoming-population 451-at a salary considerably lower than what he earned in his Denver suburb. Green chose to retire and submitted his resignation to the Postal Service on February 9, 2010, effective March 31.
On March 22-41 days after submitting his resignation paperwork to the Postal Service on February 9, but 96 days after signing the settlement agreement on December 16-Green contacted an Equal Employment Opportunity (EEO) counselor to report an unlawful constructive discharge. He contended that his supervisors had threatened criminal charges and negotiated the resulting agreement in retaliation for his original complaint.[1] He *1775 alleged that the choice he had been given effectively forced his resignation in violation of Title VII.
Green eventually filed suit in the Federal District Court for the District of Colorado, alleging, inter alia, that the Postal Service constructively discharged him. The Postal Service moved for summary judgment, arguing that Green had failed to make timely contact with an EEO counselor within 45 days of the "matter alleged to be discriminatory," as required by 29 CFR § 1614.105(a)(1). The District Court granted the Postal Service's motion for summary judgment.
The Tenth Circuit affirmed, holding that the "matter alleged to be discriminatory" encompassed only the Postal Service's discriminatory actions and not Green's independent decision to resign on February 9. Green v. Donahoe, 760 F.3d 1135 (2014). Therefore, the 45-day limitations period started running when both parties signed the settlement agreement on December 16, 2009. Accordingly, because 96 days passed between the agreement and when Green contacted an EEO counselor on March 22, 2010, his constructive-discharge claim was time barred.
Two other Courts of Appeals agree with the Tenth Circuit's view that the limitations period begins to run for a constructive-discharge claim after the employer's last discriminatory act.[2] As the Tenth Circuit recognized, however, other Courts of Appeals have held that the limitations period for a constructive-discharge claim does not begin to run until the employee resigns.[3]
We granted certiorari to resolve this split. 575 U.S. ----, 135 S.Ct. 1892, 191 L.Ed.2d 762 (2015). Because no party here supports the Tenth Circuit's holding that an employee's resignation is not part of the "matter alleged to be discriminatory," we appointed Catherine M.A. Carroll to defend that aspect of the judgment below. 576 U.S. ----, 136 S.Ct. 14, 386, 193 L.Ed.2d 308 (2015). She has ably discharged her duties and the Court thanks her for her service.
II
Before a federal civil servant can sue his employer in court for discriminating against him in violation of Title VII, he must first exhaust his administrative remedies. 42 U.S.C. § 2000e-16(c). To exhaust those remedies, the Equal Employment Opportunity Commission (EEOC) has promulgated regulations that require, among other things, that a federal employee consult with an EEO counselor prior to filing a discrimination lawsuit. Specifically, he "must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." 29 CFR § 1614.105(a)(1).[4] The timeliness *1776 of Green's claim therefore turns on our interpretation of this EEOC regulation implementing Title VII.[5]
Although we begin our interpretation of the regulation with its text, the text in this case is not particularly helpful. Nowhere does § 1614.105indicate whether a "matter alleged to be discriminatory" in a constructive-discharge claim includes the employee's resignation, as Green contends, or only the employer's discriminatory conduct, as amica contends. The word "matter" simply means "an allegation forming the basis of a claim or defense," Black's Law Dictionary 1126 (10th ed. 2014)-a term that could readily apply to a discrimination-precipitated resignation. So the "matter alleged to be discriminatory" could refer to all of the allegations underlying a claim of discrimination, including the employee's resignation, or only to those allegations concerning the employer's discriminatory conduct. We therefore must turn to other canons of interpretation.
The most helpful canon in this context is "the 'standard rule' " for limitations periods. Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson, 545 U.S. 409, 418, 125 S.Ct. 2444, 162 L.Ed.2d 390 (2005). Ordinarily, a " 'limitations period commences when the plaintiff has a complete and present cause of action.' " Ibid. "[A] cause of action does not become 'complete and present' for limitations purposes until the plaintiff can file suit and obtain relief." Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., 522 U.S. 192, 201, 118 S.Ct. 542, 139 L.Ed.2d 553 (1997). Although the standard rule can be displaced such that the limitations period begins to run before a plaintiff can file a suit, we "will not infer such an odd result in the absence of any such indication" in the text of the limitations period. Reiter v. Cooper, 507 U.S. 258, 267, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993).
Applying this default rule, we are persuaded that the "matter alleged to be discriminatory" in a constructive-discharge claim necessarily includes the employee's resignation for three reasons. First, in the context of a constructive-discharge claim, a resignation is part of the "complete and present cause of action" necessary before a limitations period ordinarily begins to run. Second, nothing in the regulation creating the limitations period here, § 1614.105, clearly indicates an intent to displace this standard rule. Third, practical considerations confirm the merit of applying the standard rule here. We therefore interpret the term "matter alleged to be discriminatory" for a constructive-discharge claim to include the date Green resigned.
A
The standard rule for limitations periods requires us first to determine what is a "complete and present cause of action" for a constructive-discharge claim. We hold that such a claim accrues only after an employee resigns.
The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his "working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." Pennsylvania State Police v. Suders, 542 U.S. 129, 141, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004). When the employee resigns in *1777 the face of such circumstances, Title VII treats that resignation as tantamount to an actual discharge. Id., at 142-143, 124 S.Ct. 2342.
A claim of constructive discharge therefore has two basic elements. A plaintiff must prove first that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign. Id., at 148, 124 S.Ct. 2342. But he must also show that he actually resigned. Ibid. ("A constructive discharge involves both an employee's decision to leave and precipitating conduct ..." (emphasis added)). In other words, an employee cannot bring a constructive-discharge claim until he is constructively discharged. Only after both elements are satisfied can he file suit to obtain relief.
Under the standard rule for limitations periods, the limitations period should begin to run for a constructive-discharge claim only after a plaintiff resigns. At that point-and not before-he can file a suit for constructive discharge. So only at that point-and not before-does he have a "complete and present" cause of action. And only after he has a complete and present cause of action does a limitations period ordinarily begin to run. Cf. Mac's Shell Service, Inc. v. Shell Oil Products Co., 559 U.S. 175, 189-190, 130 S.Ct. 1251, 176 L.Ed.2d 36 (2010)(the limitations period for a constructive termination of a franchise agreement starts running when the agreement is constructively terminated).
In this respect, a claim that an employer constructively discharged an employee is no different from a claim that an employer actually discharged an employee. An ordinary wrongful discharge claim also has two basic elements: discrimination and discharge. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); 1 B. Lindemann, P. Grossman, & C. Weirich, Employment Discrimination Law 21-33 (5th ed. 2012) (Lindemann) ("The sine qua non of a discharge case is, of course, a discharge"). The claim accrues when the employee is fired. At that point-and not before-he has a "complete and present cause of action." So at that point-and not before-the limitations period begins to run.
With claims of either constructive discharge or actual discharge, the standard rule thus yields the same result: a limitations period should not begin to run until after the discharge itself. In light of this rule, we interpret the term "matter alleged to be discriminatory" in § 1614.105to refer to all of the elements that make up a constructive-discharge claim-including an employee's resignation.
B
Although the standard rule dictates that a limitations period should commence only after a claim accrues, there is an exception to that rule when the text creating the limitations period clearly indicates otherwise. See, e.g., Dodd v. United States, 545 U.S. 353, 360, 125 S.Ct. 2478, 162 L.Ed.2d 343 (2005). Nothing in the text of Title VII or the regulation, however, suggests that the standard rule should be displaced here. To the contrary, the language of the regulation confirms our application of the default rule.
As noted previously, the word "matter" generally refers to "an allegation forming the basis of a claim or defense." Black's Law Dictionary 1126. The natural reading of "matter alleged to be discriminatory" thus refers to the allegation forming the basis of the discrimination claim-here, a claim of constructive discharge. And as discussed above, a constructive discharge claim requires two basic allegations:
*1778 discriminatory conduct by the employer that leads to resignation of the employee. So long as those acts are part of the same, single claim under consideration, they are part of the "matter alleged to be discriminatory," whatever the role of discrimination in each individual element of the claim. Cf. National Railroad Passenger Corporation v. Morgan, 536 U.S. 101, 115-121, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)(holding that a hostile-work-environment claim is a single "unlawful employment practice" that includes every act composing that claim, whether those acts are independently actionable or not).
C
Finally, we are also persuaded that applying the standard rule for limitations periods to constructive discharge makes a good deal of practical sense. Starting the limitations clock ticking before a plaintiff can actually sue for constructive discharge serves little purpose in furthering the goals of a limitations period-and it actively negates Title VII's remedial structure. Cf. Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 398, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982)(holding that the Title VII limitations period should be construed to "honor the remedial purpose of the legislation as a whole without negating the particular purpose of the filing requirement").
This Court has recognized "that the limitations perio[d] should not commence to run so soon that it becomes difficult for a layman to invoke the protection of the civil rights statutes." Delaware State College v. Ricks, 449 U.S. 250, 262, n. 16, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). If the limitations period begins to run following the employer's precipitating discriminatory conduct, but before the employee's resignation, the employee will be forced to file a discrimination complaint after the employer's conduct and later amend the complaint to allege constructive discharge after he resigns. Nothing in the regulation suggests it intended to require a layperson, while making this difficult decision, to follow such a two-step process in order to preserve any remedy if he is constructively discharged.
Moreover, forcing an employee to lodge a complaint before he can bring a claim for constructive discharge places that employee in a difficult situation. An employee who suffered discrimination severe enough that a reasonable person in his shoes would resign might nevertheless force himself to tolerate that discrimination for a period of time. He might delay his resignation until he can afford to leave. Or he might delay in light of other circumstances, as in the case of a teacher waiting until the end of the school year to resign. Tr. 17. And, if he feels he must stay for a period of time, he may be reluctant to complain about discrimination while still employed. A complaint could risk termination-an additional adverse consequence that he may have to disclose in future job applications.
III
Amica and the dissent read "matter alleged to be discriminatory" as having a clear enough meaning to displace our reliance on the standard rule for limitations periods. They argue that "matter" is not equivalent to "claim" or "cause of action," and that the use of the phrase "matter alleged to be discriminatory" is a sufficiently clear statement that the standard claim accrual rule should not apply. According to amica and the dissent, "matter" refers only to the discriminatory acts of the Postal Service, not Green's resignation.
We disagree. There is nothing inherent in the phrase "matter alleged to be discriminatory" that clearly limits it to employer *1779 conduct. Rather, as discussed above, the term can reasonably be interpreted to include the factual basis for a claim. Green is not alleging just that the Postal Service discriminated against him. He claims that the discrimination left him no choice but to resign.
Amica and the dissent dispute that a constructive discharge is a separate claim. According to amica and the dissent, the constructive-discharge doctrine merely allows a plaintiff to expand any underlying discrimination claim to include the damages from leaving his job, thereby increasing his available remedies. See 1 Lindemann 21-49 (constructive discharge allows plaintiff to seek backpay, front pay, or reinstatement). In support of this argument, amica and the dissent emphasize this Court's statement in Suders that "[u]nder the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes ." 542 U.S., at 141, 124 S.Ct. 2342(emphasis added); see also id., at 148, 124 S.Ct. 2342("[A] constructive discharge is functionally the same as an actual termination in damages-enhancing respects").
But the Court did not hold in Suders that a constructive discharge is tantamount to a formal discharge for remedial purposes exclusively. To the contrary, it expressly held that constructive discharge is a claim distinct from the underlying discriminatory act. Id., at 149, 124 S.Ct. 2342(holding that a hostile-work-environment claim is a "lesser included component" of the "graver claim of hostile-environment constructive discharge"). This holding was no mere dictum. See id., at 142, 124 S.Ct. 2342("[A] claim for constructive discharge lies under Title VII"). We see no reason to excise an employee's resignation from his constructive-discharge claim for purposes of the limitations period.
The concurrence sets out a theory that there are two kinds of constructive discharge for purposes of the limitations period: constructive discharge "claims" where the employer "makes conditions intolerable with the specific discriminatory intent of forcing the employee to resign, " and constructive discharge "damages" where the employer does not intend to force the employee to quit, but the discriminatory conditions of employment are so intolerable that the employee quits anyway. Post, at 1785 - 1788 (ALITO, J., concurring in judgment). According to the concurrence, the limitations period does not begin to run until an employee resigns under the "claim" theory of constructive discharge, but begins at the last discriminatory act before resignation under the "damages" theory.
This sometimes-a-claim-sometimes-not theory of constructive discharge is novel and contrary to the constructive discharge doctrine. The whole point of allowing an employee to claim "constructive" discharge is that in circumstances of discrimination so intolerable that a reasonable person would resign, we treat the employee's resignation as though the employer actually fired him. Suders, 542 U.S., at 141-143, 124 S.Ct. 2342.[6] We do *1780 not also require an employee to come forward with proof-proof that would often be difficult to allege plausibly-that not only was the discrimination so bad that he had to quit, but also that his quitting was his employer's plan all along.
Amica and the dissent also argue that their interpretation is more consistent with this Court's prior precedent on when the limitations period begins to run for discrimination claims. Under their interpretation, Green's resignation was not part of the discriminatory "matter," but was instead the mere inevitable consequence of the Postal Service's discriminatory conduct, and therefore cannot be used to extend the limitations period. See Brief for Court-Appointed Amica Curiae in Support of Judgment Below 21-27 (Brief for Amica Curiae ) (citing Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, 127 S.Ct. 2162, 167 L.Ed.2d 982 (2007), overruled by statute, Lilly Ledbetter Fair Pay Act of 2009, 123 Stat. 5; Delaware State College v. Ricks, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431; United Air Lines, Inc. v. Evans, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977)); post, at 1791 - 1794 (THOMAS, J., dissenting) (citing Ricks, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431, and Chardon v. Fernandez, 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981)(per curiam )). Similarly, the concurrence argues these cases require that an act done with discriminatory intent must occur within the limitations period. Post, at 1784 (opinion of ALITO, J.).
But these cases are consistent with the standard rule that a limitations period begins to run after a claim accrues, not after an inevitable consequence of that claim. In Ricks, for example, the Court considered the discrimination claim of a college faculty member who was denied tenure and given a 1-year " 'terminal' " contract for his last year teaching. 449 U.S., at 258, 101 S.Ct. 498. The plaintiff's claim accrued-and he could have sued-when the college informed him he would be denied tenure and gave him "explicit notice that his employment would end" when his 1-year contract expired. Ibid . The Court held that the limitations period began to run on that date, and not after his 1-year contract expired. That final year of teaching was merely an inevitable consequence of the tenure denial the plaintiff claimed was discriminatory.
Green's resignation, by contrast, is not merely an inevitable consequence of the discrimination he suffered; it is an essential part of his constructive-discharge claim. That is, Green could not sue for constructive discharge until he actually resigned. Of course, Green could not resign and then wait until the consequences of that resignation became most painful to complain. For example, he could not use the date of the expiration of his health insurance after his resignation to extend the limitations period. But the "inevitable consequence" principle of Ricks, Ledbetter, and Evans does not change the focus of *1781 the limitations period, which remains on the claim of discrimination itself. See Lewis v. Chicago, 560 U.S. 205, 214, 130 S.Ct. 2191, 176 L.Ed.2d 967 (2010)(holding Evans and its progeny "establish only that a Title VII plaintiff must show a present violation within the limitations period" (internal quotation marks omitted)); National Railroad Passenger Corporation v. Morgan, 536 U.S., at 115-121, 122 S.Ct. 2061(holding limitations period for hostile-work-environment claim runs from the last act composing the claim).[7] For a constructive discharge, the claim does not exist until the employee resigns.
Finally, amica contends that her interpretation of the regulation better advances the EEOC's goal of promoting conciliation for federal employees through early, informal contact with an EEO counselor. See Exec. Order No. 11478, § 4, 34 Fed. Reg. 12986 (1969)(counseling for federal employees "shall encourage the resolution of employee problems on an informal basis"). The dissent suggests that our holding will make a discrimination victim the master of his complaint, permitting him to " 'exten[d] the limitation[s period] indefinitely' " by waiting to resign. Post, at 1794 (opinion of THOMAS, J.). The concurrence claims that an employee who relies on the limitations period in waiting to resign is "doubly out of luck" if his otherwise-meritorious discrimination claim is time barred and he cannot show the discrimination was so intolerable that it amounted to a constructive discharge. Post, at 1789 (opinion of ALITO, J.).
These concerns are overblown. Amica may be right that it is more difficult to achieve conciliation after an employee resigns. But the same is true for a federal civil servant who is fired by his agency for what the employee believes to be a discriminatory purpose. And neither decision is necessarily permanent-a resignation or a termination may be undone after an employee contacts a counselor. Conciliation, while important, does not warrant treating a constructive discharge different from an actual discharge for purposes of the limitations period.
As for the dissent's fear, we doubt that a victim of employment discrimination will continue to work in an intolerable environment merely because he can thereby extend the limitations period for a claim of constructive discharge. If anything, a plaintiff who wishes to prevail on the merits of his constructive discharge claim has the opposite incentive. A claim of constructive discharge requires proof of a causal link between the allegedly intolerable conditions and the resignation. See 1 Lindemann 21-45, and n. 106.
And as for the concurrence's double-loser concern, no plaintiff would be well advised to delay pursuing what he believes to be a meritorious non-constructive-discharge-discrimination claim on the ground *1782 that a timely filed constructive discharge claim could resuscitate other time-lapsed claims. The 45-day limitations period begins running on any separate underlying claim of discrimination when that claim accrues, regardless of whether the plaintiff eventually claims constructive discharge. The limitations-period analysis is always conducted claim by claim.
IV
Our decision that a resignation triggers the limitations period for a constructive-discharge claim raises the question of when precisely an employee resigns. Here, Green and the Government agree that an employee resigns when he gives his employer definite notice of his intent to resign. If an employee gives "two weeks' notice"-telling his employer he intends to leave after two more weeks of employment-the limitations period begins to run on the day he tells his employer, not his last day at work. (This issue was not addressed by the Tenth Circuit and, accordingly, amica takes no position on it. See Brief for Amica Curiae 42.)
We agree. A notice rule flows directly from this Court's precedent. In Ricks, 449 U.S., at 250, 101 S.Ct. 498and Chardon v. Fernandez, 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6, the Court explained that an ordinary wrongful-discharge claim accrues-and the limitations period begins to run-when the employer notifies the employee he is fired, not on the last day of his employment. Ricks, 449 U.S., at 258-259, 101 S.Ct. 498; Chardon, 454 U.S., at 8, 102 S.Ct. 28. Likewise, here, we hold that a constructive-discharge claim accrues-and the limitations period begins to run-when the employee gives notice of his resignation, not on the effective date of that resignation.
One factual issue remains: when exactly Green gave the Postal Service notice of his resignation. The Government argues that Green resigned on December 16, 2009-when he signed the settlement agreement-and that his claim is therefore still time barred. Green argues that he did not resign until February 9, 2010-when he submitted his retirement paperwork-and that his claim is therefore timely. We need not resolve this issue. Having concluded that the limitations period for Green's constructive-discharge claim runs from the date he gave notice of his resignation, we leave it to the Tenth Circuit to determine when this in fact occurred.
* * *
For these reasons, we vacate the judgment of the Tenth Circuit and remand the case for further proceedings consistent with this opinion.
So ordered.
Justice ALITO, concurring in the judgment.
In its pursuit of a bright-line limitations rule for constructive discharge claims, the Court loses sight of a bedrock principle of our Title VII cases: An act done with discriminatory intent must have occurred within the limitations period. We have repeatedly held that the time to pursue an employment discrimination claim starts running when a discriminatory act occurs, and that a fresh limitations period does not start upon the occurrence of a later nondiscriminatory act-even if that later act carries forward the effects of the earlier discrimination. See, e.g., United Air Lines, Inc. v. Evans, 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); Delaware State College v. Ricks, 449 U.S. 250, 257-258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980); Chardon v. Fernandez, 454 U.S. 6, 8, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981)(per curiam );
*1783 Lorance v. AT & T Technologies, Inc., 490 U.S. 900, 907-908, 911, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989); National Railroad Passenger Corporation v. Morgan, 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, 628, 127 S.Ct. 2162, 167 L.Ed.2d 982 (2007). Without mentioning this consistent line of precedent, the Court categorically declares that the limitations period for constructive discharge cases starts upon the employee's resignation, no matter when the last discriminatory act occurred. This effectively disposes of the discriminatory-intent requirement.
Rather than jettison our precedent, I would hold that the limitations period for constructive discharge claims-like all other employment discrimination claims-starts running upon a discriminatory act of the employer. But I would also hold that an employee's resignation can, in many cases, be considered a discriminatory act of the employer. This is so where an employer subjects an employee to intolerable working conditions with the discriminatory intent to force the employee to resign . In these circumstances, the employee's consequent resignation is tantamount to an intentional termination by the employer, and so gives rise to a fresh limitations period just as a conventional termination would. Absent such intent, however, the resignation is not an independent discriminatory act but merely a delayed consequence of earlier discrimination. The resignation may be a basis for enhancing damages in a claim brought on the underlying discrimination, but it cannot restart the limitations clock.
In this case, Green presented sufficient evidence that the Postal Service intended to force him to resign when it presented him with a settlement agreement requiring that he either retire or transfer to a distant post office for much less pay. Accordingly, the 45-day window for him to initiate counseling opened when he gave the Postal Service notice of his resignation.
I
A
The regulation at issue here requires a federal employee who complains of unlawful discrimination to initiate contact with an Equal Employment Opportunity (EEO) counselor "within 45 days of the date of the matter alleged to be discriminatory." 29 CFR § 1614.105(a)(1) (2015). The Court observes that this language "is not particularly helpful" in resolving the question presented, and so it quickly moves on to other considerations. Ante, at 1776. I think that more can be discerned from the regulation's text. The Court observes that a "matter" in this context is "an allegation forming the basis of a claim or defense." Black's Law Dictionary 1126 (10th ed. 2014); ante, at 1776. But the Court fails to plug in the regulation's critical qualifier: The matter must be (alleged to be) discriminatory . The phrase "matter alleged to be discriminatory" is thus most fairly read to refer to the allegation of discrimination that underlies an employee's claim, not just any fact that supports the claim.
Even if the regulation's text were unclear on this point, the next place I would look is not to a "standard rule" governing limitations periods, as the majority does, ibid., but to the specific limitations rules we apply in other Title VII cases. Private-sector Title VII plaintiffs are required to file a charge with the Equal Employment Opportunity Commission (EEOC) within 180 or 300 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1); see Morgan, supra (construing this statutory provision).
*1784 [1] Although this language is not identical to the regulation at issue here, nothing in either text requires that they be read as setting different rules. Indeed, the EEOC's Compliance Manual treats them the same-it describes the regulation as requiring federal employees to contact a counselor within 45 days of "the alleged discriminatory employment practice, " and it cites Morgan as providing the governing standard.[2] We also granted review in this case on the premise that the same rule would apply to both federal-sector and private-sector Title VII cases: Green's petition and merits brief ask us to decide when the filing period for constructive discharge claims begins as a matter of "federal employment discrimination law" generally, Pet. for Cert. i; Brief for Petitioner i, and the Circuit split he alleges consists primarily of cases in which the limitations period ran from the date of an unlawful employment "practice," see Pet. for Cert. 11-16. The majority, for its part, seems to agree that the same rules should apply in the federal and private sectors, and it too relies on private-sector cases in describing the Circuit split that today's decision is meant to "resolve." Ante, at 1775 - 1776, and nn. 2-4. The majority's relegation of our Title VII timeliness cases to its rebuttal argument, see ante, at 1779 - 1781, is thus surprising.
B
Our Title VII precedents set somewhat different limitations rules for claims based on a discrete act of discrimination (such as termination, failure to hire, or demotion) and claims based on a hostile work environment. I will focus on the former set of rules because Green's resignation was a discrete act that was precipitated by another discrete act-namely, the settlement agreement that required him to retire or transfer to a far-off, lower paying position. For private-sector claims based on discrete acts, the limitations period starts to run on the day the discriminatory act occurred and expires 180 or 300 days later. Morgan, 536 U.S., at 110, 122 S.Ct. 2061. This means that an act done with discriminatory intent -not merely some act bearing on the claim-must have occurred within the limitations period. We therefore held in Morgan that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges," and that "a time-barred act [cannot] justify filing a charge concerning a termination that was not independently discriminatory ." Id., at 113, 122 S.Ct. 2061(emphasis added).
We spoke even more directly to the point in Ledbetter . There we described "discriminatory intent" as the "defining element" of a Title VII disparate-treatment claim, 550 U.S., at 624, 127 S.Ct. 2162and held that the plaintiff's claim of pay discrimination was untimely because she did not allege that any "intentionally discriminatory conduct occurred during the [limitations] period," id., at 628, 127 S.Ct. 2162. Although the plaintiff had suffered lower pay within the limitations period because of earlier alleged discrimination, we explained that under our precedents a new *1785 limitations period "does not commenc[e] upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination." Ibid. (discussing Evans, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571, Ricks, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431, Lorance, 490 U.S. 900, 109 S.Ct. 2261, 104 L.Ed.2d 961, and Morgan, supra ). Relying on nondiscriminatory acts to establish a timely claim, we reasoned, would impermissibly "shift intent from one act (the act that consummates the discriminatory employment practice) to a later act that was not performed with bias or discriminatory motive. The effect of this shift would be to impose liability in the absence of the requisite intent." 550 U.S., at 629, 127 S.Ct. 2162. At the same time, we recognized that when multiple acts that are each "intentionally discriminatory" occur, "a fresh violation takes place"-and thus a new limitations period starts running-"when each act is committed." Id., at 628, 127 S.Ct. 2162.[3]
C
These principles lead to the following rule for constructive discharge cases: An employee's resignation triggers a fresh limitations period if the resignation itself constitutes an "intentionally discriminatory" act of the employer. In my view, an employee's resignation in the face of intolerable working conditions can be considered a discriminatory act of the employer when the employer makes conditions intolerable with the specific discriminatory intent of forcing the employee to resign . If the employer lacks that intent, however, the limitations period runs from the discriminatory act that precipitated the resignation.
This approach reflects the fact that there are two kinds of constructive discharge. Much of the disagreement between the majority and dissent stems from their differing views of the nature of constructive discharge. To the majority, constructive discharge is always a standalone "claim distinct from the underlying discriminatory act." Ante, at 1779. To Justice THOMAS and the friend of the Court we appointed to defend the judgment below, constructive discharge is never a separate claim, but merely "a counterdefense to an employer's contention that a resignation was voluntary" that allows the resigning employee to recover backpay and other relief unavailable to employees who quit voluntarily. Post, at 1795. As I see it, each side is partly right. The label "constructive discharge" is best understood to refer to two different (though related) concepts, one a distinct claim and one not. This case requires us to distinguish between the two and to "identify with care the specific employment practice that is at issue." Ledbetter, supra, at 624, 127 S.Ct. 2162(citing Morgan, supra, at 110-111, 122 S.Ct. 2061).
1
The first kind of constructive discharge occurs when an employer subjects an employee to intolerable conditions with the specific discriminatory intent of forcing the employee to quit. In this situation, the employer has deliberately terminated the employee-a discrete employment action. The discharge is termed "constructive," however, because it is formally effected by *1786 the employee's resignation rather than the employer's pink slip. The termination can nevertheless be considered a discriminatory act of the employer because the employer intends to terminate the employee and-through the imposition of intolerable conditions-forces the employee to "rubberstamp" that decision by resigning. Cf. Staub v. Proctor Hospital, 562 U.S. 411, 425, 131 S.Ct. 1186, 179 L.Ed.2d 144 (2011)(ALITO, J., concurring in judgment); id., at 419, 131 S.Ct. 1186(majority opinion) ("Animus and responsibility for [an] adverse action can both be attributed to [an] earlier agent ... if the adverse action is the intended consequence of that agent's discriminatory conduct"). Because the resignation is the "act that consummates the discriminatory employment practice" of terminating the employee, Ledbetter, supra, at 629, 127 S.Ct. 2162it triggers a fresh limitations period. In such cases, the constructive discharge should, like a formal discharge, be treated as a distinct cause of action-what we might call a proper "constructive discharge claim."
The employer's discriminatory intent sometimes will manifest itself only outside the limitations period. Consider, for example, an employer that demotes an employee (say, from executive to office assistant) for discriminatory reasons and with the intent that the loss of prestige will force the employee to quit. By the time the employee finally cracks and resigns, the discriminatory demotion may be outside the limitations window and not independently actionable. But the employer's discriminatory intent to terminate the employee can carry forward to the eventual resignation. We recognized this possibility in Ledbetter . We explained that a plaintiff generally cannot create a timely Title VII claim by "attach[ing]" the discriminatory intent accompanying an act outside the limitations period to another act that occurred within the limitations period. 550 U.S., at 625, 629, 127 S.Ct. 2162. At the same time, we acknowledged that "there may be instances where the elements forming a cause of action"-discriminatory intent and an employment action-"span more than 180 days" (that is, the applicable limitations period). Id., at 631, n. 3, 127 S.Ct. 2162. In such a case, we said, the limitations period would start to run when "the employment practice was executed," because that is when "[t]he act and intent had ... been joined." Ibid. Under my example, then, the employer "forms an illegal discriminatory intent" to terminate the employee at the time of the demotion, but the termination is not "executed" or "consummated" until the employee resigns some time later. Ibid. ; id., at 629, 127 S.Ct. 2162. Only at that point have the discriminatory intent to terminate and the act of termination been "joined," and therefore only at that point does the limitations period for the wrongful discharge start to run.
2
The second kind of constructive discharge occurs when an employer imposes intolerable conditions for discriminatory reasons but does not intend to force an employee to resign. This is quite different from an ordinary discharge because the critical element of intent is missing. The resignation cannot be considered an intentionally discriminatory act of the employer because it is not something the employer deliberately brought about; it is simply a later-arising consequence of the earlier discrimination. The resignation thus does not trigger a fresh limitations period or give rise to a separate cause of action. See Evans, 431 U.S., at 558, 97 S.Ct. 1885(A nondiscriminatory act that "gives present effect to a past act of discrimination" is not actionable); Ricks, 449 U.S., at 258, 101 S.Ct. 498("[T]he proper focus is upon the time of the discriminatory acts, not *1787 upon the time at which the consequences of the acts became most painful" (internal quotation marks and brackets omitted)); Ledbetter, supra, at 628, 127 S.Ct. 2162("A new violation does not occur, and a new [limitations] period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination").
This does not let the employer off the hook. It is still liable for the acts of discrimination that precipitated the resignation, provided that the employee properly and timely challenges them. And in a suit brought on those underlying acts, the resignation-if reasonable-"is assimilated to a formal discharge for remedial purposes ." Pennsylvania State Police v. Suders, 542 U.S. 129, 141, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004)(emphasis added). The resigning employee can recover, as damages for the underlying discrimination, "all damages [that would be] available for formal discharge" but which are normally unavailable to employees who voluntarily quit. Id., at 147, n. 8, 124 S.Ct. 2342; see post, at 1794 - 1795 (THOMAS, J., dissenting). A resignation that is the reasonable but unintended result of the employer's discriminatory acts thus does not lead to a standalone "constructive discharge claim." Instead, it is a basis for increasing damages on the underlying discrimination claim-what we might call a "constructive discharge damages enhancement." See Suders, supra, at 148, 124 S.Ct. 2342(analogizing constructive discharge to "an actual termination in damages-enhancing respects").[4]
The majority asserts that in Suders the Court "expressly held" that constructive discharge is always its own distinct claim. Ante, at 1779. I do not think that the Suders Court would have taken such pains to qualify its statements that a constructive discharge is akin to an actual termination "for remedial purposes" and "in damages-enhancing respects," 542 U.S., at 141, 148, 124 S.Ct. 2342had that been its intention. Nor was it necessary for the Court to resolve whether constructive discharge is a separate cause of action or merely a basis for enhancing damages. The majority observes that Suders referred to a "claim" for constructive discharge. See ante, at 1779. But the use of that term does not indicate that constructive discharge is (always) an independent cause of action any more than stray references to a "claim for punitive damages," e.g., BMW of North America, Inc. v. Gore, 517 U.S. 559, 564, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 58, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995), mean that punitive damages are actionable independent of an underlying tort claim.
The majority also asserts that intent to cause a resignation is unnecessary for a constructive discharge cause of action because the "whole point" of constructive discharge is to treat the resignation like a firing. Ante, at 1779. I had thought that the "whole point" of a Title VII disparate-treatment claim was to combat intentional discrimination. See, e.g., Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 1002, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988)(Blackmun, J., joined by Brennan and Marshall, JJ., concurring in part and concurring in judgment) ("[A] disparate-treatment challenge focuses exclusively on the *1788 intent of the employer"). A resignation cannot be deemed the equivalent of an actionable intentional termination if the employer lacks intent to terminate. See Staub, 562 U.S., at 417-418, 131 S.Ct. 1186(holding that a person who "did not intend to cause [a] dismissal" cannot be deemed "responsible" for the dismissal, even if the dismissal was the "result" or "foreseeable consequence" of the person's actions); see also id., at 417, 131 S.Ct. 1186("Intentional torts such as this ... generally require that the actor intend the consequences of an act, not simply the act itself" (internal quotation marks omitted)). But as I have explained, a resignation in those circumstances may still be treated like a firing for damages purposes. Our cases demand nothing more.
II
A
The framework I propose respects the fundamental rule that an act done with discriminatory intent must have occurred within the limitations period. It also comports with the default rule that limitations periods start to run when a cause of action accrues. When an employer intends to force an employee to resign, the resignation gives rise to a new cause of action for constructive discharge, with a limitations period that runs from the date of the resignation. But when an employer does not intend to force the employee to resign, the employee's only cause of action is based on the underlying discriminatory acts, and the limitations period runs from the time that claim accrued.[5] It is thus entirely unnecessary for the majority to abandon the discriminatory-intent requirement in service of the "standard" limitations rule. These two rules fit together perfectly once one appreciates the dual nature of constructive discharge.
It is abundantly clear that the majority has abandoned the discriminatory-intent requirement and would deem a constructive discharge claim timely even if no discriminatory act occurred within the limitations period. The majority admits as much. It declares that the employer's discriminatory conduct and the employee's resignation are both "part of the 'matter alleged to be discriminatory,' " and therefore (in its view) the resignation may trigger the limitations period "whatever the role of discrimination in [the resignation] element." Ante, at 1777 (emphasis added). To support this dubious proposition, the majority cites Morgan 's holding that an individual act contributing to a hostile work environment need not be independently actionable for the act to start a fresh limitations period. Ante, at 1777 - 1778. This analogy is particularly inapt because Green's constructive discharge claim is based on a discrete act, not a hostile work environment. See supra, at 1784. Even setting that aside, Morgan held only that an act contributing to a hostile work environment need not be independently actionable by dint of its severity . That is because a hostile work environment claim is based on the "cumulative effect of individual acts" that may not " 'sufficiently affect the conditions of employment to implicate Title VII' " unless considered in the aggregate. 536 U.S., at 115, 122 S.Ct. 2061(emphasis added). Nothing in Morgan suggests that the limitations *1789 period for a hostile work environment claim can run from an act that is not discriminatory . To the contrary, the Court referred to individual "act[s] of harassment "-such as "racial jokes, ... racially derogatory acts, ... negative comments regarding the capacity of blacks to be supervisors, and ... various racial epithets"-as triggering the limitations period. Id., at 115, 120, 122 S.Ct. 2061(emphasis added).
B
The majority opines that its rule is better for employees because it prevents the limitations period from expiring before an employee resigns. Ante, at 1778. Things are not that simple. The majority's rule benefits only those employees who can meet the demanding standard for constructive discharge, while setting a springe for those who cannot. Constructive discharge is an "aggravated" form of discrimination involving truly "intolerable" working conditions that leave an employee no choice but to resign. Suders, 542 U.S., at 146-147, 124 S.Ct. 2342. This is an objective standard, id., at 141, 124 S.Ct. 2342and what is subjectively intolerable to a particular employee may strike a court or jury as merely unpleasant.
So imagine an employee who is subjected to sexual harassment at her federal workplace but-relying on the majority's rule-does not pursue EEO counseling until 45 days after the harassment leads her to resign. Suppose too that the last act of harassment occurred the day before she resigned. If a court ultimately concludes that the harassment was objectively intolerable and the employee was justified in resigning, she can recover for the constructive discharge. But if it turns out that she has proved only "ordinary discrimination" without the "something more" needed to establish constructive discharge, id., at 147, 124 S.Ct. 2342(internal quotation marks omitted), the employee is doubly out of luck: Not only does her constructive discharge fail on the merits, but any "lesser included" hostile work environment claim that she might have brought (and prevailed on), id., at 149, 124 S.Ct. 2342is time barred. Encouraging employees to wait until after resigning to pursue discrimination claims thus may needlessly deprive unwary discrimination victims of relief.
The better approach is to encourage employees to seek EEO counseling (or, in the private sector, file an EEOC charge) at the earliest opportunity, based on the underlying discriminatory acts.[6] Every allegation of constructive discharge must be based on an actionable discriminatory practice, see ibid. ; 1 B. Lindemann, P. Grossman, & C. Weirich, Employment Discrimination Law 21-49 (5th ed. 2012), for which the employee can immediately seek counseling and pursue a discrimination claim. If the employee later resigns, he or she can seek damages from the resignation as part of that timely claim. See supra, at 1787, and n. 4. Under the framework I have set forth, an employee who fails to pursue the underlying discrimination claim can still pursue a standalone constructive discharge claim so long as there is sufficient evidence that the employer acted with intent to force the employee to resign. This will often be the case when working conditions are so intolerable that a reasonable employee would be compelled to quit. The employer will usually be aware that conditions are terrible, and "[p]roof that a defendant acted knowingly very often *1790 gives rise to a reasonable inference that the defendant also acted purposely." Loughrin v. United States, 573 U.S. ----, ----, 134 S.Ct. 2384, 2398, 189 L.Ed.2d 411 (2014)(ALITO, J., concurring in part and concurring in judgment).[7] But the possibility of recovering damages for only the constructive discharge, and not for discrimination suffered before the resignation, will be an unsatisfactory alternative for many employees who have suffered through unendurable working conditions.
III
It remains to apply the foregoing principles to this case. The Tenth Circuit held that the Postal Service was entitled to summary judgment on its limitations defense. The question therefore is whether Green adduced sufficient evidence from which a jury could reasonably conclude that the Postal Service intended to force his resignation when it presented him with the settlement agreement. If so, then the limitations period ran from the date of Green's resignation.
I have little trouble concluding that Green has carried his burden. Indeed, the Postal Service virtually concedes the point. It observes that the agreement expressly stated that Green would retire, and provided for his reporting to duty in Wamsutter, Wyoming, only in the event that the retirement fell through. App. 60-61; Brief for Respondent 33. A jury could reasonably conclude that the Postal Service, by offering Green a choice between retiring and taking a lower paying job hundreds of miles away, intended to make him choose retirement. Accordingly, for summary judgment purposes, the 45-day window for contacting an EEO counselor ran from the date on which Green resigned-or, more precisely, the date on which he gave the Postal Service notice of his retirement, see ante, at 1782.
I am inclined to agree with Green that-viewing the evidence in the light most favorable to him-he did not give notice of his retirement until he submitted his retirement papers, making his claim timely. Although the settlement agreement provided that he would retire, it alternatively allowed him to transfer to Wyoming. Unless Green would have been turned away from the Wamsutter Post Office despite that language had he chosen to go there, it was not until Green submitted his retirement papers that one could say with certainty that his position would be terminated rather than transferred. That said, like the majority I am content to leave this question for the Tenth Circuit to tackle on remand. I accordingly concur in the judgment.

We assume without deciding that it is unlawful for a federal agency to retaliate against a civil servant for complaining of discrimination. See Gómez-Pérez v. Potter, 553 U.S. 474, 488, n. 4, 128 S.Ct. 1931, 170 L.Ed.2d 887 (2008); Brief for Respondent 2.

Mayers v. Laborers' Health and Safety Fund of North America, 478 F.3d 364, 370 (C.A.D.C.2007)(per curiam ); Davidson v. Indiana-American Water Works, 953 F.2d 1058, 1059 (C.A.7 1992).

Flaherty v. Metromail Corp., 235 F.3d 133, 138 (C.A.2 2000); Draper v. Coeur Rochester, Inc., 147 F.3d 1104, 1111 (C.A.9 1998); Hukkanen v. Operating Engineers, 3 F.3d 281, 285 (C.A.8 1993); Young v. National Center for Health Servs. Research, 828 F.2d 235, 238 (C.A.4 1987).

This regulation, applicable to federal employees only, has a statutory analog for private-sector Title VII plaintiffs, who are required to file a charge with the EEOC within 180 or 300 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). Although the language is different, the EEOC treats the federal and private-sector employee limitations periods as identical in operation. See EEOC Compliance Manual: Threshold Issues § 2-IV(C)(1), n. 179.

Green does not contend that his alleged constructive discharge is a "personnel action." See Brief for Petitioner 17-18; Green v. Donahoe, 760 F.3d 1135, 1144, n. 3 (C.A.10 2014). We therefore address the "matter alleged to be discriminatory" clause only.

The concurrence suggests that its theory is consistent with statements in the Suders opinion that constructive discharge is akin to an actual discharge " 'for remedial purposes' " and in " 'damages-enhancing respects.' " Post, at 1787 - 1788 (opinion of ALITO, J.) (quoting Suders, 542 U.S., at 141, 148, 124 S.Ct. 2342). This ignores the more obvious explanation for this qualification: The Court was distinguishing between the merits of a claim of constructive discharge generally, where resignation is imputed as a discriminatory act of the employer, and the affirmative defense available to an employer in a hostile work environment claim specifically, which allows an employer to defend against a hostile work environment claim in certain circumstances if it took no " 'official act' " against the employee. Id., at 143-146, 124 S.Ct. 2342. The Court in Suders recognized that it would be bizarre to always impute resignation as an "official act" of the employer in a constructive discharge hostile work environment case and prohibit the employer from relying on the no-"official-act" defense, because it would make it easier to prove the "graver" claim of a constructive discharge hostile work environment than to prove a hostile work environment claim. Id., at 148-149, 124 S.Ct. 2342. Thus, the Court declined to hold that resignation in a constructive discharge case was categorically an "official act" in all instances. Ibid. In other words, the Court sought a measure of parity between constructive discharge and ordinary discrimination-parity that we extend to the limitations period here.

The dissent relies on Morgan 's other holding that, unlike a hostile-work-environment claim that may comprise many discriminatory acts, discrete claims of discrimination based on independent discriminatory acts cannot be aggregated to extend the limitations period. See post, at 1791 - 1792 (opinion of THOMAS, J.) (citing 536 U.S., at 109-113, 122 S.Ct. 2061). But this just proves the point: The analysis for the limitations period turns on the nature of the specific legal claim at issue. In Morgan, the Court noted that even if a claim of discrimination based on a single discriminatory act is time barred, that same act could still be used as part of the basis for a hostile-work-environment claim, so long as one other act that was part of that same hostile-work-environment claim occurred within the limitations period. Id., at 117, 122 S.Ct. 2061("It is precisely because the entire hostile work environment encompasses a single unlawful employment practice that we do not hold, as have some of the Circuits, that the plaintiff may not base a suit on individual acts that occurred outside the statute of limitations ...").

Title VII defines the term "employer" to include "agent[s]" of the employer. 42 U.S.C. § 2000e(b).

Title VII does not provide federal employees with a cause of action for retaliation. Ante, at 1774 - 1775, n. 1. Title VII's federal-sector provision incorporates certain private-sector provisions related to discrimination but does not incorporate the provision prohibiting retaliation in the private sector. See 42 U.S.C. § 2000e-16(d)(incorporating §§ 2000e-5(f)to (k)but not § 2000e-3(a), which forbids private-sector retaliation). In light of this text, I have grave doubts that Green-as a federal employee-has a claim for retaliation. But because the parties do not raise this issue, and the majority leaves it open, I need not resolve it.

Congress has since abrogated Ledbetter 's precise holding in the context of "discrimination in compensation," Lilly Ledbetter Fair Pay Act of 2009, § 3, 123 Stat. 5, codified at 42 U.S.C. § 2000e-5(e)(3)(A), but it did not disturb the reasoning of the precedents on which Ledbetter was based. Cf. Ledbetter, supra, at 627, n. 2, 127 S.Ct. 2162(discussing similar amendment abrogating the precise holding of Lorance v. AT & T Technologies, Inc., 490 U.S. 900, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989)).

These enhanced damages would also be available in a suit based on the underlying discrimination where the employer intended to make the employee resign. Intent to force the resignation is necessary to pursue constructive discharge as a separate claim from the underlying discrimination, but it certainly does not prevent an employee from pursuing greater damages for the underlying discrimination on a constructive discharge theory.

For example, if an unintended resignation was prompted by a discrete act like a humiliating demotion or transfer, the limitations period would run from the date of demotion or transfer. See Morgan, 536 U.S., at 110-113, 122 S.Ct. 2061. If the resignation was prompted by an intolerable hostile work environment, the limitations period would run from any act that contributed to the hostile work environment. See id., at 117-118, 122 S.Ct. 2061.

The majority seems to agree that employees should promptly challenge the underlying discrimination, see ante, at 1781 - 1782, so why it disparages the idea elsewhere in its opinion, see ante, at 1778, is beyond me.

Given this inference, it is hard to see why the majority thinks that it "would often be difficult to allege plausibly" that such an employer intended to force the employee to resign. Ante, at 1779 - 1780. It is not inherently more difficult (and it will often be easier) to allege and prove that an employer intended the foreseeable consequences of its actions than it is to allege and prove that an employer acted because of discriminatory animus against an employee's race, sex, religion, or other protected characteristic-a burden every Title VII plaintiff must carry.