# United States Court of Appeals

## For the First Circuit

No. 15-2178

ROSA CARMINA RODRIGUEZ; ALEXIS E. AGOSTINI; RAYMOND U. ARROYO;
CARL C. CHRISTENSEN; ERNESTO L. CRUZ; MANUEL Q. CRUZ; SHIRLEY
Y.M. CUMMINS; LINDA T. KUAILANI; ROY LYNCH; RAFAEL A. MARTINEZ;
ALBERT E. MILLER; JULIA Q. NORMAN; HILDAMAR ORTIZ; REGINALD
KENALIO PUANA; IVAN O. PUIG; CYNTHIA JEAN ROMNEY; VICTOR L.
ROSARIO; CELIA A. RUIZ; JOEL A. TUTEIN,

Plaintiffs, Appellants,

v.

UNITED STATES OF AMERICA; THE UNITED STATES OFFICE OF PERSONNEL
MANAGEMENT; BETH F. COBERT, Acting Director of the United States
Office of Personnel Management,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Nancy Torresen,[*] Chief U.S. District Judge]

Before

Howard, Chief Judge,
Dyk,[**] and Thompson, Circuit Judges.

Adam H. Charnes, with whom Christin J. Jones, Thurston H.
Webb, and Kilpatrick Townsend & Stockton LLP were on brief, for
appellants.
Stephanie R. Marcus, Attorney, Appellate Staff, Civil
Division, United States Department of Justice, with whom Benjamin

---

[*] Of the District of Maine, sitting by designation.

[**] Of the Federal Circuit, sitting by designation.

C. Mizer, Principal Deputy Assistant Attorney General, Rosa E. Rodríguez-Vélez, United States Attorney, and Marleigh D. Dover, Attorney, Appellate Staff, Civil Division, United States Department of Justice, were on brief, for appellees.

---

March 24, 2017

---

**DYK, Circuit Judge**. Plaintiffs challenge the Office of Personnel Management's ("OPM") regulations that exclude cost-of-living allowances ("COLAs")[1] from the calculation of retirement and other benefits. These COLAs are received by federal employees working in non-foreign areas located outside the contiguous United States. Plaintiffs allege that these regulations are unlawfully discriminatory under Title VII of the Civil Rights Act of 1964, Pub L. No. 88-352, 78 Stat. 241, 253–66, and are arbitrary, capricious, and contrary to law under the Administrative Procedure Act ("APA"). The district court dismissed plaintiffs' complaint. We affirm.

## I.

Although we conclude that in many respects the merits of plaintiffs' claims are not before us, we briefly outline the issues underlying the dispute. This case concerns the calculation of retirement and other benefits for federal employees working in non-foreign areas located outside the contiguous United States. These areas include at least Puerto Rico, the U.S. Virgin Islands, Guam, the Northern Mariana Islands, Hawaii, and Alaska. In

---

[1] These cost-of-living allowances, which are based on differences in geographic location of employment, are distinct from "cost-of-living adjustments" (also confusingly known as "COLAs"), which are annual adjustments to federal employment pay schedules based on inflation. See Beer v. United States, 696 F.3d 1174, 1177 (Fed. Cir. 2012) (en banc). The cost-of-living adjustments are not at issue in this case.

- 3 -

addition to their normal salaries, federal employees working in these areas receive cost-of-living allowances, or COLAs, calculated based on "living costs substantially higher than in the District of Columbia." 5 U.S.C. § 5941(a)(1). Congress first provided for such payments (then called "additional compensation") in 1948, and Congress provided the President with authority to issue regulations governing the payments.[2]

Pursuant to that congressional authority, on September 16, 1948, President Truman issued Executive Order 10,000, 13 Fed. Reg. 5453. In the order, President Truman delegated authority to the United States Civil Service Commission ("CSC") (predecessor of OPM) to prescribe regulations. 13 Fed. Reg. at 5455. On December 30, 1948, the CSC promulgated the regulations at issue in this case. See Territorial Post Differentials and Territorial Cost-of-Living Allowances, 13 Fed. Reg. 8725 (1948).

The 1948 CSC regulations provided for COLA payments, but they stated that COLAs are not part of the "base used in computing" entitlements such as retirement benefits. 13 Fed. Reg. at 8727, § 350.6(f). This rule excluding COLA payments from basic pay for retirement purposes persists in OPM's regulations today. 5 C.F.R.

---

[2] See Independent Offices Appropriations Act of 1949, Pub. L. No. 80-491, § 207, 62 Stat. 176, 194 (1948); Supplemental Independent Offices Appropriations Act of 1949, Pub. L. No. 80-862, § 104, 62 Stat. 1196, 1205 (1948); see also 5 U.S.C. § 5941(a) ("[T]he allowance is paid only in accordance with regulations prescribed by the President . . . .").

- 4 -

§ 591.239(b). The consequence, under the regulations, is that employees receiving COLA payments earn lower retirement annuities than they would earn were the COLA payments included in their basic pay. We refer to this exclusion of COLA from base pay as the "exclusionary rule."

Plaintiffs complain that the exclusionary rule is contrary to law because, plaintiffs assert, there is no basis for the exclusionary rule in either the statute or Executive Order 10,000. The government contends that the exclusionary rule is mandated by statute. The government explains that the statutory definition of "basic pay" for federal employees in the retirement laws explicitly excludes "allowances." See 5 U.S.C. § 8331(3) ("'basic pay' . . . does not include . . . allowances" under the Civil Service Retirement System ("CSRS")); see also id. § 8401(4) (incorporating the CSRS definition of "basic pay" into the Federal Employees' Retirement System ("FERS")). The current statute governing COLA payments refers to those payments as "allowances." Id. § 5941(a)(1). Therefore, the government reasons, COLAs are allowances and must be excluded from basic pay. The government also notes that COLAs are exempt from federal income tax. See 26 U.S.C. § 912(2).

Plaintiffs do not agree that COLAs are "allowances" within the meaning of the retirement laws. Plaintiffs argue that when COLAs were established in 1948, Congress referred to them as

"additional compensation" rather than "allowances." See 5 U.S.C. § 118h (1952). Plaintiffs contend that no interpretive significance should be attributed to the United States Code's 1966 recodification,[3] when Congress in the COLA statute replaced the terminology "additional compensation" with the "allowances" terminology. See H.R. Rep. No. 89-901, at 117 (1965) ("The word 'allowances' is substituted for 'additional compensation' as a more apt term and for consistency."). Plaintiffs argue that the 1966 recodification was not intended to introduce substantive changes and, thus, the COLA statute's mere change in terminology introducing the label "allowances" in 1966 cannot justify the exclusionary rule.

Plaintiffs further complain that the rule also unlawfully discriminates against COLA payment recipients, many of whom are minorities that make up significant populations in COLA areas. Plaintiffs contend that "today, federal employees in COLA areas are the only class of federal employees in the United States whose regular compensation for normal working hours in their place of permanent residence is not included in their retirement base." Plaintiffs' Br. 11-12.

---

[3] Act of Sept. 6, 1966, Pub. L. No. 89-554, 80 Stat. 378, 512-13.

Plaintiffs are a group of 19 current and former federal employees working in the non-foreign COLA areas. Plaintiffs filed a class action complaint in the United States District Court for the District of Puerto Rico challenging the exclusionary rule on behalf of a putative class of similarly situated current and former employees and surviving spouses of such employees. Plaintiffs named the United States, OPM, and the Director of OPM (collectively, "the government") as defendants. The complaint, as later amended, seeks a declaratory judgment that the exclusionary rule is arbitrary, capricious, and contrary to law under the APA and that the rule unlawfully discriminates against protected minorities in COLA areas in violation of Title VII, 42 U.S.C. § 2000e-16. With respect to the discrimination claims, the complaint alleges both that the rule is the product of discriminatory intent ("disparate treatment" claim) and that it improperly and adversely impacts minorities ("disparate impact" claim).

On August 20, 2015, upon the government's motion, the district court dismissed plaintiffs' amended complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). The court first held that the disparate impact claim was barred by the safe harbor provision of Title VII, which provides that "it shall not be an unlawful employment practice for an employer to apply different standards

of compensation . . . to employees who work in different locations" absent an intention to discriminate because of protected status. 42 U.S.C. § 2000e-2(h).  The court next determined that plaintiffs had failed to administratively exhaust their disparate treatment claim before OPM.  Finally, the court held that the nondiscrimination claims were precluded by the Civil Service Reform Act of 1978 ("CSRA"), which required plaintiffs to pursue their claims at the Merit Systems Protection Board ("MSPB"), with appeal to the Federal Circuit.

Plaintiffs appeal.  We have jurisdiction pursuant to 28 U.S.C. § 1291.

## III.

We review a district court's dismissal for lack of subject matter jurisdiction and for failure to state a claim de novo.  McCloskey v. Mueller, 446 F.3d 262, 266 (1st Cir. 2006). We "accept[] the plaintiffs' well-pleaded facts as true and indulg[e] all reasonable inferences to their behoof."  Id.

There is no contention that plaintiffs have failed to administratively exhaust their disparate impact claim, as opposed to their other claims.  The question is whether the district court correctly held that this claim is barred by the safe harbor provision of 42 U.S.C. § 2000e-2(h).  Answering this question requires first determining whether § 2000e-2(h) is a definitional provision that encompasses disparate impact for both private

- 8 -

employers and the federal government, or—as plaintiffs argue—an affirmative defense that only applies to private employers.

It is, thus, necessary to an understanding of the Title VII provisions applicable to the federal government to understand the provisions applicable to private employers—provisions that pre-date the federal employment provisions. The Supreme Court interpreted the Title VII provisions applicable to private employers to prohibit employment policies creating a disparate impact in Griggs v. Duke Power Co., 401 U.S. 424 (1971). In Griggs, the Court explained that "[t]he Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." Id. at 431. Under Title VII, a claim for disparate impact covers "practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities." Ricci v. DeStefano, 557 U.S. 557, 577 (2009).

However, not all employer actions that have a disparate impact are unlawful. Section 2000e-2(h) provides a safe harbor for employers that compensate their employees differently depending on the location of employment. It provides, in relevant part,

> Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment . . . to employees who work in different

- 9 -

locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin.

Id. (emphasis added).  This section does not preclude claims of intentional discrimination, but it does preclude claims of disparate impact.  Candelario Ramos v. Baxter Healthcare Corp. of Puerto Rico, 360 F.3d 53, 62 (1st Cir. 2004).  In Candelario Ramos, this court explained that "different treatment in different locations is permissible absent an intent to discriminate."  Id. at 61.  The court also explained that § 2000e-2(h) does not merely provide a defense to disparate impact claims, but it instead serves to define unlawful discrimination.  See id. at 62.  Differences in compensation depending on location of employment, by itself, is not unlawful discrimination.  The court concluded:

> The subsection itself is not surprising. Location is often a proxy for differences in cost and other competitive circumstances; and while Congress could have made those circumstances a separate defense, the difficulties of showing that a difference in pay precisely correlated with a difference in cost would be formidable.  In effect, different locations are simply a safe harbor in cases where there is no intentional discrimination.

Id. (citation omitted).

The Supreme Court has also made clear that, as to seniority plans, § 2000e-2(h) is "a provision that itself 'delineates which employment practices are illegal and thereby prohibited and which are not.'"[4]  Lorance v. AT & T Techs., Inc.,

_____

[4] The portion of § 2000e-2(h) relating to seniority plans is

- 10 -

490 U.S. 900, 908 (1989), <u>superseded on other grounds by statute</u>, Civil Rights Act of 1991, Pub. L. No. 102-166, sec. 112, 105 Stat. 1071, 1078-79 (quoting <u>Franks</u> v. <u>Bowman Transp. Co.</u>, 424 U.S. 747, 758 (1976)); <u>see also</u> <u>NAACP, Detroit Branch</u> v. <u>Detroit Police Officers Ass'n</u>, 900 F.2d 903, 908 (6th Cir. 1990) (explaining that under <u>Lorance</u>, § 2000e-2(h) "has been regarded as a definitional provision").  Plaintiffs argue that the key language of <u>Lorance</u> (quoted above) is inapposite because that case addressed only the seniority plan provision of § 2000e-2(h) and not the location-based safe harbor provision, and that the location-based safe harbor is an affirmative defense.

However, we see no reason to read these two portions of § 2000e-2(h) differently or to regard the location-based safe harbor as an affirmative defense.  To the extent that circuit cases before <u>Lorance</u> treated § 2000e-2(h) generally as an affirmative defense,[5] we think they are no longer good law after <u>Lorance</u>.  Nor is it significant that certain provisions of the Equal Pay Act,

_____

contained in the same clause as the location-based safe harbor; the clause provides in relevant part, "it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, . . . or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin."

[5] <u>See</u> <u>Jackson</u> v. <u>Seaboard Coast Line R. Co.</u>, 678 F.2d 992, 1013 (11th Cir. 1982).

which bear some resemblance to several provisions in § 2000e-2(h), have been characterized as affirmative defenses.  See Washington Cty. v. Gunther, 452 U.S. 161, 168–69 (1981); Rodriguez v. Smithkline Beecham, 224 F.3d 1, 6 (1st Cir. 2000).[6]

The relevant legislative history of the 1964 Act also shows that Congress intended § 2000e-2(h) to explain what is not unlawful discrimination.  See 110 Cong. Rec. 12,723 (June 4, 1964) (Statement of Sen. Humphrey) (explaining that the provision "makes clear that it is only discrimination on account of race, color, religion, sex, or national origin, that is forbidden by the title. The [provision] does not narrow application of the title, but merely clarifies its present intent and effect."); see also Am. Tobacco Co. v. Patterson, 456 U.S. 63, 73 n.11 (1982).

This distinction between defining the scope of liability and providing an affirmative defense is pertinent to whether the provision applies to the federal government.  Plaintiffs' central

---

[6] This is not to suggest that every aspect of § 2000e-2(h) defines the offense.  It may be that the "Bennett Amendment," a separate portion of § 2000e-2(h), provides an affirmative defense. The Bennett Amendment provides, "[i]t shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of Title 29."  § 2000e-2(h).  Unlike the location-based safe harbor, the Bennett Amendment cross-references 29 U.S.C. § 206(d), which as noted above includes four provisions that have been described as affirmative defenses under the Equal Pay Act.

argument is that, even if the location-based safe harbor provision limits liability in the private sector, it is inapplicable to the federal government. Plaintiffs reason that the section applies to "employers," and Title VII excludes the federal government from the definition of "employer." See 42 U.S.C. § 2000e(b) ("The term 'employer' . . . does not include . . . the United States . . . ."). This court previously assumed, without explanation, that § 2000e-2(h) applies to the federal government. Cartagena v. Sec'y of Navy, 618 F.2d 130, 134–35 (1st Cir. 1980) (per curiam). We now confirm that this is so and provide further explanation.

As originally enacted in 1964, Title VII did not apply to the federal government. See Civil Rights Act of 1964, Pub. L. No. 88-352, § 701(b), 78 Stat. 241, 253; Brown v. Gen. Servs. Admin., 425 U.S. 820, 825 (1976). This was accomplished by excluding the federal government from the definition of "employer." As a result, each of the substantive provisions of Title VII prohibiting employment discrimination—as well as the safe harbor provision of § 2000e-2(h)—applied at that time only to non-government "employers."[7]

In 1972, Congress extended Title VII coverage to federal employees. See Equal Employment Opportunity Act of 1972, Pub. L.

---

[7] Title VII also applied to employment agencies, labor organizations, and various types of training programs. See generally 42 U.S.C. § 2000e-2.

- 13 -

No. 92-261, § 11, 86 Stat. 103, 111–13 (codified as amended at 42 U.S.C. § 2000e-16).  Rather than simply amend the definition of "employer" to include the United States, Congress created an entirely new section of Title VII specifically (and only) applicable to federal employment.  See 42 U.S.C. § 2000e-16.  It provided in general that

> All personnel actions affecting employees or applicants for employment . . . in executive agencies . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin.

§ 717(a), 86 Stat. at 111 (codified as amended at 42 U.S.C. § 2000e-16(a)).

Through the 1972 Act, Congress intended to "accord[] '(a)ggrieved (federal) employees or applicants . . . the full rights available in the courts as are granted to individuals in the private sector under title VII.'"  Chandler v. Roudebush, 425 U.S. 840, 841 (1976) (quoting S. Rep. No. 92-415, at 16 (1971)).  Thus, "[i]n general, it may be said that the substantive anti-discrimination law embraced in Title VII was carried over and applied to the Federal Government."  Morton v. Mancari, 417 U.S. 535, 547 (1974).[8]

---

[8] See Ponce v. Billington, 679 F.3d 840, 844 (D.C. Cir. 2012) ("It is well-established that [42 U.S.C. § 2000e-16(a)] legislated for federal employees essentially the same guarantees against . . . discrimination that previously it had afforded private employees. Thus, the general provisions of Title VII apply with equal force in both private and federal-sector cases." (quotation marks and citations omitted) (ellipses in original)); Mlynczak v. Bodman, 442 F.3d 1050, 1057 (7th Cir. 2006) ("[T]he substance of the

It is undisputed that the 1972 amendment made the prohibition on disparate impact discrimination applicable to federal employers. Because, as we have described above, the definition of disparate impact discrimination is determined, in part, by the safe harbor provision at issue here, § 2000e-2(h), the safe harbor provision necessarily applies equally to federal employers. In other words, because § 2000e-2(h) limits the scope of liability, rather than providing an affirmative defense, the 1972 amendments incorporating disparate impact liability necessarily included the location-based safe harbor.

Plaintiffs make much of the fact that in 1972 and the years following, Congress incorporated by reference into the provision governing federal employment (§ 2000e-16) several private-sector provisions of Title VII, but chose not to incorporate the safe harbor provision of § 2000e-2(h). See 42 U.S.C. § 2000e-16(d), (f). For example, § 2000e-16(d) now

---

federal employee's right in [§ 2000e-16(a)] is the same as the more familiar rights assured to all other employees . . . ."); Larson on Employment Discrimination § 63.02 (2015) (explaining that § 2000e-16(a) "has usually been interpreted by the courts to mean that substantive Title VII standards applicable to private employment were intended to apply to federal workers"); see also Morales-Vallellanes v. Potter, 605 F.3d 27, 35–36 (1st Cir. 2010) ("Unlike its private-sector counterpart, Title VII does not contain an express antiretaliation provision applicable to the federal government as employer. Nonetheless, we have assumed that the antiretaliation provision applicable to private employers operates to prohibit retaliation in the federal sector." (citation omitted)).

provides, "[t]he provisions of section 2000e-5(f) through (k) of this title, as applicable, shall govern civil actions brought hereunder, and the same interest to compensate for delay in payment shall be available as in cases involving nonpublic parties." The incorporated sections relate only to enforcement procedures. The failure to incorporate the substantive provisions into § 2000e-16 in the years after 1972 hardly suggests that Congress intended that the substantive standards applicable to private employees would not apply to federal employees given that was the central purpose of the 1972 amendments.[9]

Plaintiffs argue that more recent amendments to Title VII also support their position. Plaintiffs point out that in 1991, Congress amended Title VII again, this time, among other things, to define and insert a new term, "respondent," which includes the federal government in certain newly enacted provisions of § 2000e-2. See Civil Rights Act of 1991, Pub. L. No. 102-166, § 104, 105 Stat. 1071, 1074. As amended, § 2000e

---

[9] The specific incorporation of certain procedural aspects of the private-sector Title VII sections into the federal provision was necessary because § 2000e-16 deviated from Title VII's procedural scheme. Through § 2000e-16, Congress created "an exclusive, pre-emptive administrative and judicial scheme for the redress of federal employment discrimination." Brown, 425 U.S. at 829; see also 42 U.S.C. § 2000e-16(b) (permitting the Equal Employment Opportunity Commission ("EEOC"), inter alia, to promulgate regulations providing for appropriate remedies); id. § 2000e-16(c) (providing the right to file a civil action following administrative review procedures specific to federal employees).

defines "respondent" in relevant part as "an employer . . . or Federal entity subject to section 2000e-16 of this title." 42 U.S.C. § 2000e(n). But Congress did not amend the safe harbor provision of § 2000e-2(h) to include "respondents." Plaintiffs suggest that this inaction evidences congressional intent that the safe harbor not apply to the federal government. We disagree. Plaintiffs' inference hardly follows since Congress in 1991 did not amend any other existing subsections of § 2000e-2 to include the term "respondent," and those subsections generally have been held to apply with equal force to federal employers in keeping with the purposes of the 1972 amendment. Adopting plaintiffs' argument would mean that the substantive provisions applicable to private employers would not apply to the federal government, a position inconsistent with established authority.

We hold that the rule set forth in § 2000e-2(h) applies to discrimination claims brought against the federal government. Because plaintiffs conceded that their disparate impact claim would be precluded by this rule if it applies in this case, we affirm the district court's dismissal of the disparate impact claim.

## IV.

The next question is whether the district court correctly dismissed plaintiffs' intentional discrimination (disparate treatment) claim for lack of administrative exhaustion.

It is settled that a federal court will not entertain employment discrimination claims brought under Title VII unless administrative remedies have first been exhausted. Fantini v. Salem State Coll., 557 F.3d 22, 26 (1st Cir. 2009). The requirement of administrative exhaustion serves to "provide the employer with prompt notice of the claim and to create an opportunity for early conciliation." Id. It is equally settled that an exhaustion requirement applies to federal employees as well as private sector employees. 42 U.S.C. § 2000e-16(c); Green v. Brennan, 136 S. Ct. 1769, 1775 (2016); Velazquez-Ortiz v. Vilsack, 657 F.3d 64, 71 (1st Cir. 2011).

In the federal employment context, the exhaustion requirement demands that, as a prerequisite to filing suit in district court, a federal employee "seek relief in the agency that has allegedly discriminated against him." Brown, 425 U.S. at 832. This means that a complainant must first file a formal complaint with the Equal Employment Opportunity ("EEO") office of the allegedly discriminating agency. See 29 C.F.R. § 1614.106(a). The complaint "must be sufficiently precise to identify the aggrieved individual and the agency and to describe generally the action(s) or practice(s) that form the basis of the complaint." Id. § 1614.106(c).

A later civil action in district court is limited to the allegations of discrimination first presented in the EEO

- 18 -

complaint.  Velazquez-Ortiz, 657 F.3d at 71 ("The fact that a complainant has filed an EEO complaint does not open the courthouse door to all claims of discrimination."); Morales-Vallellanes v. Potter, 339 F.3d 9, 18 (1st Cir. 2003) ("[Plaintiff's] Title VII cause of action is limited to those discrimination and retaliation allegations in his amended complaint that were previously the subject of a formal EEO complaint.").  "This exhaustion requirement is no small matter; it 'is a condition to the waiver of sovereign immunity' and thus 'must be strictly construed.'"  Vazquez-Rivera v. Figueroa, 759 F.3d 44, 47–48 (1st Cir. 2014) (quoting Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 94 (1990)).

Plaintiffs here do not dispute these general requirements or that OPM here is the relevant agency to which they needed to submit their allegations of discrimination.  Rather, they contend that they satisfied the exhaustion requirements as to their disparate treatment claim.

The problem is that plaintiffs raised in their EEO complaint to OPM only a claim for disparate impact, and not disparate treatment.  At the heart of a claim for disparate treatment is a showing of the defendants' "discriminatory intent or motive."  Ricci, 557 U.S. at 577; see also Ray v. Ropes & Gray LLP, 799 F.3d 99, 112–13 (1st Cir. 2015).  Plaintiffs' various filings with the OPM EEO office repeatedly and explicitly alleged that the exclusionary rule has a discriminatory adverse impact on

protected minorities. For example, the addendum to each complaint has an entire section entitled, "The Agency's Exclusionary Rule Has a Disparate Impact on Racial and Ethnic Minorities in Violation of the Civil Rights Act." J.A. 528. There is no discussion of discriminatory intent in that section or elsewhere in the addendum.

Likewise, the supporting memorandum submitted by plaintiffs to OPM makes clear that plaintiffs asserted only a claim for disparate impact. The memorandum includes a section entitled, "OPM's Salary Decisions Result in a Disparate Impact in Violation of 42 U.S.C. § 2000e-16," but does not contain any discussion of discriminatory intent. J.A. 594-95. It explains that "[i]n this case, discrimination is occurring by reason of the 'disparate impact' of the agency's actions on protected minorities." Id. at 594. It points out that "[a] party need not show any intent or motive to discriminate" to make out a case for disparate impact. Id. It explains that "[w]hile there may be no discernible intent to discriminate against these minorities, the effect of exclusion statistically falls on racial minorities without any justifiable reason. This practice therefore has a disparate impact on these racial minorities." Id. at 595 (emphasis added). Elsewhere throughout the 58-page memorandum, plaintiffs refer repeatedly to the exclusionary rule's "disparate adverse impact" or effect. See J.A. 546, 568, 575, 589, 591.

Not only does the memorandum omit any allegation that OPM acted with discriminatory intent, but also it posits that when the CSC promulgated the rule excluding COLAs from the retirement base, "the agency simply acted in haste and erred as a result." J.A. 578–79. This suggests that plaintiffs were not alleging intentional discrimination.

Although plaintiffs' submissions are sprinkled with general allegations that the exclusionary rule "discriminates against protected minorities, in violation of 42 U.S.C. § 2000e-16," they contain no specific allegations of intentional discrimination. E.g. J.A. 524.[10] The closest plaintiffs come to

---

[10] See also J.A. 800 (Formal EEO Class Complaint of Rosa C. Rodriguez: "The agency's failure to include COLA in the retirement base discriminates against the large numbers of racial and ethnic minorities employed in non-foreign areas. Such discrimination has been unlawful since 1964. This discrimination was compounded in 1990, when the locality pay program was enacted. By continuing to exclude COLA from the retirement base, while locality pay is included, OPM has increased the discrimination which previously existed."). The EEO complaints filed by other class members in the record include similar language.

For background, in 1990 "locality pay" was established and made available to federal employees working within the contiguous United States. See Federal Employees Pay Comparability Act of 1990, Pub. L. No. 101-509, § 529, 104 Stat. 1389, 1427 (1990). Like COLAs, locality pay is compensation that employees receive due to higher costs of living in certain geographic areas. See 5 U.S.C. § 5304(d)(1). But locality pay is different from COLAs for benefits purposes. Unlike COLAs, locality pay is included in "basic pay" for purposes of retirement calculations, 5 U.S.C. § 5304(c)(2)(A).

In 2009, Congress created a transition program to make locality pay available to federal employees living in COLA areas. Non-Foreign AREA Retirement Equity Assurance Act, Pub. L. No. 111-

alleging intentional discrimination appears in one sentence in the memorandum that ambiguously states that the agency's rules and practices "discriminate against employees in non-foreign areas <u>and</u> have a disparate adverse impact on racial and ethnic minorities in violation of 42 U.S.C. § 2000e-16."  J.A. 546 (emphasis added). Any reasonable person reviewing plaintiffs' materials in their overall context would have understood that plaintiffs alleged only a disparate impact claim.

Nor can a disparate impact allegation somehow encompass an intentional discrimination claim on the theory that the agency would have investigated intent in connection with the disparate impact claim.  See <u>Thornton</u> v. <u>United Parcel Serv., Inc.</u>, 587 F.3d 27, 31–32 (1st Cir. 2009) ("[T]he scope of a civil action is not determined by the specific language of the charge filed with the agency, but rather, may encompass acts of discrimination which the . . . investigation could reasonably be expected to uncover.") (citation omitted); <u>Fantini</u>, 557 F.3d at 27; <u>Jorge</u> v. <u>Rumsfeld</u>, 404 F.3d 556, 565 (1st Cir. 2005).  Courts have contrasted claims of disparate treatment and disparate impact as involving different facts and evidence,[11] and given the significant differences between

84, tit. XIX, subtitle B, §§ 1911-19, 123 Stat. 2190, 2619-27 (2009).  There is no contention that the 2009 Act affects this appeal.

[11]  See <u>Texas Dep't of Cmty. Affairs</u> v. <u>Burdine</u>, 450 U.S. 248, 252 n.5 (1981) ("We have recognized that the factual issues, and therefore the character of the evidence presented, differ when the

those theories, other circuits have held that an administrative charge raising one theory generally does not exhaust the other.[12] We reach the same conclusion.

Plaintiffs alternatively argue that they raised intentional discrimination in a statement later filed with the EEOC (but not with OPM in the first instance). The district court held that this statement does not satisfy the exhaustion requirement. We agree.

Federal employees pursuing a class complaint of discrimination, as plaintiffs do here, are subject to an administrative exhaustion procedure that differs in some respects

plaintiff claims that a facially neutral employment policy has a discriminatory impact on protected classes."); Jones v. City of Boston, 752 F.3d 38, 46 (1st Cir. 2014) ("Notably, a disparate impact claim can succeed even where the employer did not intend to discriminate. This distinguishes the disparate impact cause of action from the more traditional disparate treatment approach to proving discrimination." (citation omitted)).

[12] See Abdus-Shahid v. Mayor and City Council of Baltimore, No. 15-2181, 2017 WL 35725, at *7 (4th Cir. Jan. 4, 2017) (disparate treatment charge did not exhaust disparate impact); Burgis v. N.Y. City Dep't of Sanitation, 798 F.3d 63, 71 (2d Cir. 2015) (same); Pacheco v. Mineta, 448 F.3d 783, 792 (5th Cir. 2006) (same); Diersen v. Walker, 117 F. App'x 463, 465–66 (7th Cir. 2004) (same); Brown v. Puget Sound Elec. Apprenticeship & Training Trust, 732 F.2d 726, 730 (9th Cir. 1984) ("Any investigation of whether [plaintiff's] application was rejected as the result of disparate impact would not have encompassed her subsequent claim that when she reapplied to the program she was subjected to intentional sex discrimination."); but cf. Gomes v. Avco Corp., 964 F.2d 1330, 1334–35 (2d Cir. 1992) (disparate treatment allegation exhausted disparate impact claim where disparate treatment allegation was based on instances of alleged differential treatment related to a facially neutral rule).

from the procedures governing individual complaints. See generally 29 C.F.R. § 1614.204. But even with respect to class complaints, the complainant must submit his allegations to the allegedly discriminating agency. The complainant must file the class complaint "with the agency that allegedly discriminated." Id. § 1614.204(c)(2). The class complaint "must identify the policy or practice adversely affecting the class as well as the specific action or matter affecting the class agent." Id. § 1614.204(c)(1). Plaintiffs did not satisfy this requirement with respect to their disparate treatment claim.

But plaintiffs point out that, after the agency EEO office receives a formal class complaint, the agency forwards the complaint and other materials to the EEOC, where the complainant has a limited opportunity to elaborate on his allegations. Id. § 1614.204(d)(1). Here, OPM forwarded plaintiffs' class complaint materials to the EEOC on June 19, 2013. On January 15, 2014, the EEOC requested that the parties submit briefing as to whether plaintiffs met the certification requirements for a class complaint (such as commonality, numerosity, etc.). In response, plaintiffs filed with the EEOC a "Statement in Support of Class Certification," in which they alleged for the first time that "[t]he acts and omissions of OPM . . . were based at least in part on discriminatory intent by the agency and its predecessor, the [CSC]." J.A. 640, 643. Plaintiffs assert that this was sufficient

for exhaustion. We disagree. Plaintiffs were required to present their claims in the first instance to the agency alleged to have engaged in discrimination.[13]

Plaintiffs rely on several non-federal-sector district court cases which suggest that later EEOC filings might be sufficient to exhaust, even if the initial EEOC charge was incomplete.[14] But these cases do not excuse presenting the claim first to the relevant agency in the federal employer context.

In sum, plaintiffs failed to exhaust their claim for disparate treatment with the OPM EEO Office, and their later filings to the EEOC did not cure this flaw. Accordingly, the district court properly dismissed the disparate treatment claim.

---

[13] To be sure, the regulations appear to contemplate that in some instances the EEOC may remand to the agency for consideration of new allegations. See 29 C.F.R. § 1614.204(d)(3) (explaining that if an allegation was not previously discussed with the counselor, and the agent provides a satisfactory explanation for this omission, the "administrative judge shall refer the allegation to the agency for further counseling" before consolidating the allegation with the class complaint); id. § 1614.204(d)(4) (explaining that if the agent provides information that "contains new allegations outside the scope of the complaint, the administrative judge shall advise the agent how to proceed on an individual or class basis concerning these allegations"). No such remand occurred here, and none was requested.

[14] See Benbow v. State Univ. of N.Y.-New Paltz, No. 1:11-CV-0870 LEK/CFH, 2014 WL 1871863, at *4 (N.D.N.Y. May 8, 2014) ("A plaintiff may exhaust her claims not only in her initial administrative charge, but also in subsequent submissions to the EEOC."); Huda v. Lockheed Martin, No. CIV. A. 07-9090, 2008 WL 191300, at *3 (E.D. La. Jan. 22, 2008).

**V.**

Finally, the district court held that plaintiffs' non-discrimination challenges were precluded by the CSRA. These non-discrimination claims seek a declaratory judgment that the exclusionary rule is arbitrary, capricious, and contrary to law under the APA. See 5 U.S.C. § 706.

As an initial matter, the government and the district court suggest that, because the relevant OPM regulations were published more than six years prior to the date on which plaintiffs filed their complaint in district court, the court lacks jurisdiction over plaintiffs' non-discrimination challenges because those challenges are barred by the six-year statute of limitations applicable to APA claims. See 28 U.S.C. § 2401(a); Trafalgar Capital Assocs., Inc. v. Cuomo, 159 F.3d 21, 34 (1st Cir. 1998).

While this may be true for procedural challenges, the statute of limitations does not require that a substantive challenge to a regulation alleging that an agency exceeded its constitutional or statutory authority be brought within six years after the regulation is adopted when the challenge arises (1) in response to application of the regulation to the challenger; or (2) after the agency denies a plaintiff's petition to amend or rescind a regulation. See Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv., 112 F.3d 1283, 1287 (5th Cir. 1997); Wind

- 26 -

River Min. Corp. v. United States, 946 F.2d 710, 715 (9th Cir. 1991); Pub. Citizen v. Nuclear Reg. Comm'n, 901 F.2d 147, 152 (D.C. Cir. 1990). Because plaintiffs assert that the regulation is invalid as applied to them, their challenge is not barred by the fact that the challenge was brought later than six years after the regulation was adopted.

**A.**

"The CSRA established a comprehensive system for reviewing personnel action taken against federal employees." United States v. Fausto, 484 U.S. 439, 455 (1988); see also Roth v. United States, 952 F.2d 611, 614 (1st Cir. 1991). This framework provides the exclusive mechanism for challenging adverse personnel actions in federal employment. In general, an aggrieved federal employee or applicant may appeal to the MSPB. 5 U.S.C. § 7701(a). Subject to limited statutory exceptions, the appellant may then petition for review of the MSPB's decision to the Federal Circuit. Id. § 7703(b)(1)(A).

A federal employee generally may not pursue alternative routes of judicial review, such as by filing a civil action in district court under the APA. The Supreme Court has recognized the primacy of the CSRA administrative review process starting at the MSPB and culminating in judicial review at the Federal Circuit. In Fausto, the Court explained that "[a] leading purpose of the CSRA was to replace the haphazard arrangements for administrative

and judicial review of personnel action, part of the 'outdated patchwork of statutes and rules built up over almost a century' that was the civil service system." 484 U.S. at 444 (quoting S. Rep. No. 95-969, at 3 (1978)). Given the remedies provided at the MSPB and on appeal to the Federal Circuit, "Congress intended to deny such employees an additional avenue of review in district court." Elgin v. Dep't of Treasury, 132 S. Ct. 2126, 2134 (2012).

This court has likewise recognized that "[t]he legislative history of the CSRA establishes beyond dispute that Congress intended that statute to provide an exclusive procedure for challenging federal personnel decisions." Roth, 952 F.2d at 615 (quoting Berrios v. Dep't of Army, 884 F.2d 28, 31 (1st Cir. 1989)); Montplaisir v. Leighton, 875 F.2d 1, 3 (1st Cir. 1989) (noting that "the Court . . . has jealously guarded [the] CSRA against inconcinnous judicial incursions").

These limitations apply as well to retirement claims, which are first reviewed by OPM and thereafter by the MSPB and the Federal Circuit. The CSRA and the statutory retirement systems (such as the CSRS and FERS) are overlapping statutory schemes that "specif[y] the benefits to which federal employees and their survivors are entitled, and provide[] a reticulated remedial regime for beneficiaries to secure review—including judicial review—of benefits determinations." Fornaro v. James, 416 F.3d 63, 66 (D.C. Cir. 2005); see also Lindahl v. Office of Pers. Mgmt.,

470 U.S. 768, 771–75, 792 (1985) ("Sections 1295(a)(9) and 7703(b)(1) together appear to provide for exclusive jurisdiction over MSPB decisions in the Federal Circuit, and do not admit any exceptions for disability retirement claims.").

This statutory regime provides that OPM "shall adjudicate all claims" regarding retirement benefits. 5 U.S.C. § 8347(b) (CSRS); accord id. § 8461(c) (FERS). After OPM renders a final decision, the statutes provide for review of OPM benefits determinations by the MSPB. Id. §§ 8347(d)(1) (CSRS), 8461(e)(1) (FERS). Employees dissatisfied by the decision of the MSPB may petition for review in the Federal Circuit. Id. § 7703(b)(1). The consequence of this extensive remedial framework is that generally the plaintiff must pursue retirement benefits claims first at OPM, then at the MSPB, and finally at the Federal Circuit.

Plaintiffs contend that their claims are outside the scope of this remedial scheme because their challenge is to an agency regulation and not to individual benefits determinations. However, in a case similar to this one, the District of Columbia Circuit recognized that the CSRA precludes review of agency actions involving retirement benefits, even if those actions have broad application. In Fornaro, a group of federal law enforcement officers and firefighters brought an action in district court seeking declaratory relief compelling OPM to grant them greater retirement annuities. 416 F.3d at 65. The plaintiffs argued that

CSRA preclusion did not apply because their claims asserted "a collateral, systemwide challenge to OPM policy." Id. at 67. Writing for the court, then-Judge Roberts held that the CSRA's "remedial provisions are exclusive," id. at 66, and "[a]llowing an alternative route to relief in the district court because plaintiffs frame their suit as a systemwide challenge to OPM policy would substitute an entirely different remedial regime for the one Congress intended to be exclusive," id. at 68.

It does not make any difference that this case includes a challenge to an OPM regulation rather than a policy and that the MSPB has determined that it does not have jurisdiction to review substantive challenges to OPM regulations.[15] In Elgin, the Supreme Court held that the CSRA review scheme was the exclusive route for discharged federal employees to contest their removal despite the fact that their petitions challenged the constitutionality of a statute. See 132 S. Ct. at 2131, 2136. The petitioners argued "that the CSRA review scheme provides no meaningful review of their claims because the MSPB lacks authority to declare a federal statute unconstitutional." Id. at 2136. Without deciding whether

---

[15] See Latham v. U.S. Postal Serv., 2012 M.S.P.B. 20, ¶ 18 (2012), superseded on other grounds by regulation, Practices and Procedures, 80 Fed. Reg. 4489, 4496 (Jan. 28, 2015) (codified at 5 C.F.R. § 1201.57(a)(4), (b)), as recognized in Lojewski v. U.S. Postal Serv., AT-0353-16-0069-I-1, 2016 WL 5939682, at ¶ 18 (M.S.P.B. Oct. 11, 2016), and Kingsley v. U.S. Postal Serv., 2016 M.S.P.B. 21, ¶ 10 (2016).

the MSPB, in fact, lacks such authority, the Court explained that the constitutional issue could be "meaningfully addressed" in the Federal Circuit, "an Article III court fully competent to adjudicate petitioners' claims." Id. at 2137. If the CSRA requires MSPB exhaustion of challenges to federal statutes, it certainly also requires MSPB exhaustion of challenges to agency regulations, at least where the claim arises as part of a challenge to a specific agency determination applicable to the plaintiffs rather than to the adoption of the regulation in the first instance.

**B.**

Plaintiffs attempt to escape the preclusive effect of the CSRA by arguing that they have brought a "mixed case" involving both discrimination and non-discrimination claims. Typically a "mixed case" is one "in which an employee challenges as discriminatory a personnel action appealable to the MSPB." Kloeckner v. Solis, 133 S. Ct. 596, 602 (2012). Under 5 U.S.C. § 7702, a federal employee can bring a mixed case in district court without following the MSPB route. "A federal employee bringing a mixed case . . . may first file a discrimination complaint with the agency itself" (here, the OPM EEO office) and "[i]f the agency decides against her, the employee may then either take the matter to the MSPB or bypass further administrative review by suing the

agency in district court." <u>Kloeckner</u>, 133 S. Ct. at 601; <u>see also</u> 5 U.S.C. § 7702(a)(2).

The government contends that, in contrast to cases involving employment actions, the mixed case framework does not excuse a claimant from exhausting non-discrimination claims for retirement benefits through the MSPB before proceeding to district court, relying on <u>Kerr</u> v. <u>Jewell</u>, 836 F.3d 1048, 1057 (9th Cir. 2016). In <u>Kerr</u>, the Ninth Circuit held that Whistleblower Protection Act ("WPA") claims involved in a mixed case could not be heard in district court where the complainant had not first presented those claims to the MSPB. <u>Id.</u> <u>Kerr</u> relied in large part on the fact that the allegedly retaliating agency declined jurisdiction to decide a WPA claim. <u>See</u> <u>id.</u> at 1056.

Here, OPM plainly had authority to render a decision on the non-discrimination claims, even if particular issues (e.g., the challenge to OPM regulations) lie outside of OPM's jurisdiction. <u>See</u> <u>Lisanti</u> v. <u>Office of Pers. Mgmt.</u>, 573 F.3d 1334, 1340 (Fed. Cir. 2009) (holding that OPM could entertain an employee's benefits claim challenging the employing agency's interpretation of "basic pay" under the CSRS because the CSRS is "a statute that OPM itself is required to administer"). Also, OPM did not decline to exercise jurisdiction. We need not decide whether the government's view is correct in the WPA context. <u>Kerr</u> has no application to situations such as here where the agency has

jurisdiction to render a decision on the benefits claims in the first instance and has not declined jurisdiction.

Nonetheless, plaintiffs cannot bring a mixed case suit involving non-discrimination claims in district court unless there has been a "personnel action appealable to the MSPB." Kloeckner, 133 S. Ct. at 602. The statute requires that a mixed case include "an action which the employee or applicant may appeal to the [MSPB]." 5 U.S.C. § 7702(a)(1)(A), (a)(2)(A). The regulations likewise define a "mixed case complaint" with an EEO office as "a complaint of employment discrimination filed with a federal agency . . . related to or stemming from an action that can be appealed to the [MSPB]." 29 C.F.R. § 1614.302(a)(1). This does not mean that an employee must actually appeal the action to the MSPB, but he must identify an action that could be appealed to the MSPB. If there is such an appealable action, it is possible to bypass the MSPB and file a mixed case in district court as explained above. But here, it is clear that plaintiffs never secured an action appealable to the MSPB.

In the context of retirement benefits claims, in general, an employee may appeal to the MSPB only an OPM final decision on an application for benefits.[16] See 5 C.F.R. §§ 831.110,

_____

[16] Plaintiffs argue that the MSPB has broad jurisdiction to review any OPM actions "affecting the rights or interests of an individual or of the United States under" the federal retirement laws. 5 U.S.C. §§ 8347(d), 8461(e). Contrary to plaintiffs'

841.308. A final decision by OPM is a written decision that is either designated as final by OPM, see id. §§ 831.109(f)(2), 841.307, or a reconsideration decision issued by OPM after its initial decision, see id. §§ 831.109(f)(1), 841.306(e). See Keira v. Merit Sys. Prot. Bd., 396 F. App'x 703, 704 (Fed. Cir. 2010) (per curiam).

Plaintiffs identify three OPM actions that, they contend, were appealable to the MSPB: (1) OPM's initial failure to respond to plaintiffs' benefits claims, which plaintiffs styled as applications for benefits; (2) OPM's issuance of a Final Interview Letter terminating EEO counseling on May 17, 2013; and (3) the failure of OPM's EEO office to make a final decision within 120 days of the filing of plaintiffs' formal class complaint. But none of these actions constitutes a final decision from OPM on any application for benefits, and therefore, plaintiffs have not secured a final decision from OPM that "the employee or applicant may appeal to the [MSPB]." 5 U.S.C. § 7702(a)(1)(A), (a)(2)(A).

Plaintiffs first argue that OPM initially failed to respond to their benefits claims, styled as applications for benefits, "regarding the unlawful discrimination and miscalculation of annuities." Plaintiffs' Reply Br. 23. They

---

suggestion, these statutes do not provide broad MSPB jurisdiction untethered to the regulations providing for MSPB review of a "final decision" of OPM. See Poole v. Dep't of Army, 2012 M.S.P.B. 32, ¶ 10 (2012).

assert—in a single sentence and with no citation to authority—that "OPM's failure to respond to any of [p]laintiffs' attempts to address their claims constituted a rejection of those claims." Id.  But such a failure to respond does not amount to a final decision under the applicable regulations, see 5 C.F.R. §§ 831.109(f), 841.306(e), 841.307 (requiring a final decision from OPM to be in writing), though OPM's failure to respond may sometimes be considered an appealable action.[17]  Because plaintiffs eschewed any effort to meaningfully develop the argument that OPM's initial failure to respond constituted a rejection of plaintiffs' claims (or to support that argument with any authority), we need not consider it.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").[18]

---

[17] The MSPB "has recognized a limited exemption to" the final-decision jurisdictional rule and "has found this exception applicable where it appeared that OPM had no intention of issuing a reconsideration decision or other further decision in the case" or "where OPM 'improperly failed to respond to [a claimant's] repeated requests for a decision.'"  Keira, 396 F. App'x at 705 (quoting McNeese v. Office of Pers. Mgmt., 61 M.S.P.R. 70, 74 (1994)).

[18] We have no occasion in this case to address the application of the appealability requirement of a mixed case under 5 U.S.C. § 7702(a)(1)-(2) in circumstances where, although OPM has not issued a final decision on an application for benefits, the MSPB would determine that it has jurisdiction to entertain an appeal under the limited exception to the final-decision rule.  See supra note 17.  We therefore express no opinion on this issue.

Second, plaintiffs argue that the Final Interview Letter terminating counseling sent by an OPM Senior EEO Specialist was an OPM action appealable to the MSPB. Once again, however, we disagree. The OPM letter was not an OPM decision on plaintiffs' benefits claims—let alone a final decision—under the applicable regulations. See 5 C.F.R. §§ 831.109(c), (f), 841.305(a), 841.306(e), 841.307. For one thing, the letter did not purport to address plaintiffs' non-discrimination claims. Instead, the EEO specialist was clearly addressing plaintiffs' discrimination claims: "Management's response into the allegations of discrimination was that the issues are a matter of law and the 'statutes allow for no discretion on the part of OPM. In the absence of discretion, there can be no improper discrimination.'" J.A. 976 (emphasis added and omitted). Indeed, the letter was sent along with the notice informing plaintiffs of their right to file a formal discrimination complaint with OPM's EEO office in accordance with 29 C.F.R. § 1614.105(d).[19]

Third, plaintiffs suggest that their later filing of a formal EEO class complaint (described above in Part IV) gave rise

---

[19] Because plaintiffs failed to raise the issue in their brief, we need not decide whether the OPM letter constituted an implicit denial of their benefits claims. See Adkins v. Office of Pers. Mgmt., 2006 M.S.P.B. 351, ¶¶ 9-10 (2006) (concluding that MSPB had jurisdiction to review OPM's implicit denial of a claim for retirement benefits); cf. Adams v. Shinseki, 568 F.3d 956, 961 (Fed. Cir. 2009) (explaining the "implicit denial" rule applicable to veterans benefits determinations).

to an OPM action appealable to the MSPB. Plaintiffs argue that under 5 U.S.C. § 7702(e)(2), the OPM EEO office's failure to resolve plaintiffs' administrative class complaint within 120 days is an action (or inaction) that is appealable to the MSPB. To be sure, an employee may appeal a mixed case complaint originally filed with an agency EEO office to the MSPB (or pursue the claims in district court) if the agency EEO office fails to resolve the complaint within 120 days. 5 U.S.C. § 7702(e)(1)(A), (2). But this framework requires the existence of a valid mixed case complaint in the first place—i.e., an administrative complaint alleging some other agency action that is within the MSPB's appellate jurisdiction. The statute and regulations are clear that in order to be a "mixed case complaint," an EEO complaint must identify some agency action that is appealable to the MSPB. There was no such action here.

Because plaintiffs did not obtain a final decision from OPM regarding their applications for benefits, they had no basis for bypassing the MSPB and filing their non-discrimination claims in district court as a mixed case.

**VI.**

In sum, the district court properly concluded that plaintiffs' disparate impact claim is barred by the location-based safe harbor provision of 42 U.S.C. § 2000e-2(h); that plaintiffs have not exhausted their administrative remedies as to their

disparate treatment claim; and that plaintiffs' non-discrimination claims were precluded by the CSRA. Accordingly, we affirm.

**AFFIRMED.**