[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No.  16-13003
_____

D.C. Docket No. 7:13-cv-02063-TMP


STEPHANIE HICKS,

Plaintiff-Appellee,

versus

CITY OF TUSCALOOSA, ALABAMA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(September 7, 2017)

Before WILSON and NEWSOM, Circuit Judges, and WOOD,[*] District Judge.

WILSON, Circuit Judge:

_____
[*]Honorable Lisa Wood, United States District Judge, for the Southern District of Georgia, sitting by designation.

Stephanie Hicks brought this action against the Tuscaloosa Police Department under the Pregnancy Discrimination Act (PDA) and the Family and Medical Leave Act (FMLA) after her reassignment and constructive discharge. Hicks prevailed at a jury trial, and the City now appeals the denial of its motion for judgment as a matter of law, its motion for a new trial, and the allegedly erroneous jury instructions. After a careful review of the record and the parties briefs, and with the benefit of oral argument, we find no reversible error on any issue; we affirm.

## I.      Background

Hicks worked for the Tuscaloosa Police Department, first as a patrol officer and then as an investigator on the narcotics task force. She was working on the narcotics task force when she became pregnant in January 2012. Hicks's captain at the time, Jeff Synder, allowed her to work on pharmaceutical fraud cases so she could avoid working nights and weekends. Lieutenant Teena Richardson, Hicks's supervisor, admitted that it bothered her that Captain Synder allowed Hicks to avoid "on call" duty. Despite Richardson telling Hicks more than once that she should take only six weeks of FMLA leave, Hicks took twelve weeks of FMLA leave from August 2012 to November 2012. Meanwhile, Captain Synder was caught embezzling and was replaced with Captain Wayne Robertson.

2

Prior to her FMLA leave, Hicks received a performance review from her supervisor Richardson that said Hicks "exceeded expectations." But on Hicks's first day back from leave, she was written up. She was also told she should start working with five to seven confidential informants. Hicks overheard Richardson talking to Captain Robertson saying "that b****,"[1] and claiming she would find a way to write Hicks up and get her out of here. And another officer overheard Richardson talking loudly about Hicks saying "that stupid c*** thinks she gets 12 weeks. I know for a fact she only gets six."

The City argued that Hicks only met with one informant and never even spoke to the others. The City also claimed that Hicks did not want to work nights, declined to meet with an informant after hours because she had to pick up her child from daycare, and chose not to attend a drug bust on a Saturday. Captain Robertson said he met with Hicks to determine why she was not working with the informants and helped her get started by arranging a ride-along with another agent and his informant. When Hicks did not follow up from the ride-along, Captain Robertson requested that Chief Steve Anderson reassign Hicks from the narcotics task force to the patrol division. Hicks countered that she worked several of the informants, and she was not introduced to the rest by their current agent. Hicks was also warned by another agent that Richardson had it out for her.

---

[1] Richardson admitted to calling Hicks a "b****."

3

Following Captain Robertson's recommendation, Chief Anderson met with Hicks in December, only eight days after she returned from FMLA leave. Chief Anderson testified that Hicks preferred Synder (her old Captain) and was not willing to comply with her new boss, Captain Robertson. Chief Anderson reassigned Hicks to the patrol division. Chief Anderson testified that he transferred Hicks solely based on Captain Robertson's recommendation and that he always followed Captain Robertson's recommendations. Captain Robertson testified that when he made his recommendation to Chief Anderson, he did not want it to look like Hicks was transferred because of her pregnancy, given that she had only been back eight days. As a result of the reassignment, Hicks lost her vehicle and weekends off, and she was going to receive a pay cut and different job duties. Additionally, officers in the narcotics task force are not required to wear ballistic vests all day, whereas patrol officers are.

After the reassignment, Richardson wrote a letter outlining the reasons for the demotion. The letter critiques Hicks because when officers went to Hicks's home to pick up her vehicle Hicks did not come to the door. Yet the letter also admits that Hicks's husband came to the door and said Hicks was breastfeeding.

Before she started back in the patrol division, Hicks took time off when a physician diagnosed her with postpartum depression. Richardson admitted that she asked Hicks if she was suffering from postpartum because "something was

4

different about [her] . . . [she] was a new mom and . . . new moms go through depressed states." During this leave for postpartum depression, Hicks's doctor wrote a letter to Chief Anderson recommending that she be considered for alternative duties because the ballistic vest she was now required to wear on patrol duty was restrictive and could cause breast infections that lead to an inability to breastfeed. But Chief Anderson did not believe that Hicks had any limitations because other breastfeeding officers had worn ballistic vests without any problems.

When she returned from leave, Chief Anderson met with Hicks again. In accordance with her doctor's suggestion, Hicks requested a desk job where she would not be required to wear a vest and assurances that she would be allowed to take breaks to breastfeed. But because Chief Anderson did not consider breastfeeding a condition that warranted alternative duty, he replied that Hicks's only options for accommodations were (1) not wearing a vest or (2) wearing a vest that could be "specially fitted" for her. He also told her that she would be assigned to a beat that allowed her access to lactation rooms, and that she could get priority to take two breastfeeding breaks per shift. But to Hicks, not wearing a vest was no accommodation at all because it was so dangerous. Furthermore, the larger or "specially fitted" vests were also ineffective because they left gaping, dangerous holes. Hicks resigned that day.

5

Hicks then filed this suit against the City of Tuscaloosa, and a jury considered four claims: (1) pregnancy discrimination, (2) constructive discharge, (3) FMLA interference, and (4) FMLA retaliation.  The jury returned with a verdict for the City on the FMLA interference claim, but in favor of Hicks on all of the other claims.  The jury found that the reassignment was discriminatory, in violation of the PDA, and retaliatory, in violation of the FMLA.  The jury also found that the City's failure to accommodate Hicks's breastfeeding requests constituted discriminatory constructive discharge, in violation of the PDA.  The jury awarded Hicks $374,000.  The magistrate judge reduced the award to $161,319.92 plus costs and attorneys' fees.

## II.    Standard of Review

We review "a district court's denial of a motion for judgment as a matter of law de novo," reviewing all evidence "in a light most favorable to the nonmoving party."  *Williams v. Dresser Indus., Inc.*, 120 F.3d 1163, 1167 (11th Cir. 1997).  And we review a district court's ruling on a motion for new trial for abuse of discretion.  *United States v. Sweat*, 555 F.3d 1364, 1367 (11th Cir. 2009) (per curiam).

## III.    Reassignment

Hicks argued that her reassignment from the narcotics task force to the patrol division was both a discriminatory violation of the PDA and retaliation in

6

violation of the FMLA.  The City argues that Hicks did not prove that each of the reasons proffered by the City for her reassignment were false and that discrimination was the real reason.  The City maintains that Hicks was reassigned for her poor job performance.  The jury found, and we agree, that there was sufficient evidence of discrimination.

The PDA amended Title VII to include discrimination "on the basis of pregnancy, childbirth, or related medical conditions."  42 U.S.C. § 2000e(k).  After a jury trial, our job is to decide the ultimate question, which is "whether the evidence, when viewed as a whole, yields the reasonable inference that the employer engaged in the alleged discrimination . . . .  Put another way, the issue is whether there is 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination.'"  *See Holland v. Gee*, 677 F.3d 1047, 1056–57 (11th Cir. 2012) (internal citation and quotation marks omitted); *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1129 (11th Cir. 1984).

To prove her claim under the FMLA, Hicks must show that: "(1)[s]he availed [her]self of a protected right under the FMLA; (2) [s]he suffered an adverse employment decision; and (3) there is a causal connection between the protected activity and the adverse employment decision."  *Wascura v. City of S. Miami*, 257 F.3d 1238, 1248 (11th Cir. 2001) (internal quotation marks omitted).

The evidence taken in the light most favorable to Hicks provides ample evidence that Hicks was both discriminated against on the basis of her pregnancy and that she was retaliated against for taking her FMLA leave.  Multiple overheard conversations using defamatory language plus the temporal proximity of only eight days from when she returned to when she was reassigned support the inference that there was intentional discrimination.

Additionally, the City's focus on comparator evidence is misplaced. Title VII does not require employees to show comparator evidence at this stage of the proceedings; it only requires evidence that there was discrimination.  Both parties structure their briefs under the *McDonnell Douglas*[2] framework, but in doing so, both parties failed to take into account the change in role of that framework at this stage in the proceedings.  While the *McDonnell Douglas* framework still has some application after a jury verdict, that role is a diminished one.  *See Holland v. Gee*, 677 F.3d 1047, 1056 (11th Cir. 2012) ("At this stage [in the proceedings, i.e., after a jury returned a verdict], the plaintiff's burden of rebutting the employer's proffered reasons merges with the plaintiff's ultimate burden of persuading the finder of fact that she has been the victim of intentional discrimination." (internal quotation marks omitted)).  At this stage, our job is only to decide if there was enough evidence for the jury to infer discrimination.  *See id*.

---

[2] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S. Ct. 1817, 1824 (1973).

We find that there was enough convincing evidence that would allow a jury to infer intentional discrimination; we affirm.

## IV.    Constructive Discharge

Hicks argued that Chief Anderson's proffered options—patrolling without a vest or patrolling with an ineffective larger vest—made work conditions so intolerable that any reasonable person would have been compelled to resign.  The City argued that Hicks failed to show that Chief Anderson harbored any discriminatory animus towards Hicks or that he deliberately made her working conditions intolerable.  The City points to the fact that Chief Anderson offered to accommodate Hicks by assigning her to a safe beat with access to lactation rooms, priority in receiving breaks, and a tailored vest.  However, the jury found that the conditions offered by Chief Anderson were so intolerable that a reasonable person would be forced to resign.

Constructive discharge claims are appropriate when "an employer discriminates against an employee to the point such that his working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Green v. Brennan*, 578 U.S. ___, ___, 136 S. Ct. 1769, 1776 (2016).  "When the employee resigns in the face of such circumstances, Title VII treats that resignation as tantamount to an actual discharge." *Id.* at 1776–77.

9

"[E]mployment discrimination, including discrimination on the basis of sex," is prohibited by Title VII of the Civil Rights Act.  *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 276–77, 107 S. Ct. 683, 687 (1987).  In response to a Supreme Court holding that discrimination on the basis of pregnancy is not sex discrimination,[3] Congress amended Title VII to include the Pregnancy Discrimination Act (PDA).  The PDA amended Title VII to add that discrimination "because of sex" or "on the basis of sex," includes discrimination "on the basis of pregnancy, childbirth, or related medical conditions."  42 U.S.C. § 2000e(k).  The issue here is whether breastfeeding is a "related medical condition[]."  The Fifth Circuit Court of Appeals has held that lactation is a related medical condition to pregnancy and thus terminations based on a woman's need to breastfeed violate the PDA.  *See E.E.O.C. v. Houston Funding II, Ltd.*, 717 F.3d 425, 428 (5th Cir. 2013)[4] ("Lactation is the physiological process of secreting milk from mammary glands and is directly caused by hormonal changes associated with pregnancy and childbirth.").  When a woman was fired after telling her employer that she was lactating and asking whether she would be permitted to use a back room to pump milk, the Fifth Circuit looked at dictionary definitions of "medical condition" and

---

[3] *See General Electric Co. v. Gilbert*, 429 U.S. 125, 136–38, 97 S. Ct. 401, 408–09 (1976).
[4]  *But cf. Wallace v. Pyro Min. Co.*, 951 F.2d 351, 351 (6th Cir. 1991) (per curiam) (holding in an unpublished opinion that because the plaintiff had not established that "breastfeeding her child was a medical necessity" the court would not decide if the PDA was applicable); *Barrash v. Bowen*, 846 F.2d 927, 931 (4th Cir. 1988) (per curiam) (stating in dicta that "[u]nder the [PDA], pregnancy and related conditions must be treated as illnesses only when incapacitating").

10

found that it includes any physiological condition, which encompasses lactation. *See id.* at 428–29. We agree with the Fifth Circuit's determination that lactation is a related medical condition and therefore covered under the PDA.[5]

A plain reading of the PDA supports the finding that the breastfeeding likewise is covered under the PDA.[6] The explicit language of the PDA says that it covers discrimination "because of" or "on the basis of sex" and is "*not limited to* [discrimination] because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k) (emphasis added). The frequently used statutory interpretation canon *ejusdem generis* states that, "when a drafter has

---

[5] While the City disputes that lactation counts as a medical condition under the PDA, this is not a novel conclusion. As one court noted, "the trend post-*Houston Funding* . . . has been to follow the Fifth Circuit's reasoning and hold that lactation is a 'condition related to pregnancy'" under the PDA." *Mayer v. Prof'l Ambulance, LLC*, 211 F. Supp. 3d 408, 417 (D.R.I. 2016); *see, e.g.*, *Allen-Brown v. D.C.*, 174 F. Supp. 3d 463, 478 (D.D.C. 2016) ("Although the D.C. Circuit has yet to address this question, the Court finds the Fifth Circuit's analysis in [*Houston Funding*] persuasive."); *EEOC v. Vamco Sheet Metals, Inc.*, 2014 WL 2619812, at *6 (S.D.N.Y. June 5, 2014) (finding that allegations that the plaintiff "was harassed for taking lactation breaks and eventually terminated . . . may [enable her] to state a claim for disparate treatment under Title VII"); *Martin v. Canon Bus. Sols., Inc.*, 2013 WL 4838913, at *8 n.4 (D. Colo. Sept. 10, 2013) ("[T]he Court agrees with a recent decision of the Fifth Circuit in which it held that 'discriminating against a woman who is lactating or expressing breast milk violates Title VII and the PDA.'").

[6] The Fifth Circuit held that discriminating against a woman because she is "lactating or expressing milk" is a violation of the PDA. *Houston Funding*, 717 F.3d at 430. Any argument that lactation and breastfeeding should be treated differently is misplaced. Such a distinction between such intertwined acts would be unworkable for courts. Furthermore, "[t]he fact that breastfeeding, unlike lactation, is a choice . . . does not change its gender-specific nature." Diana Kasdan, *Reclaiming Title VII and the PDA: Prohibiting Workplace Discrimination Against Breastfeeding Women*, 76 N.Y.U. L. Rev. 309, 339 (2001). Pregnancy is also a "choice," but Congress has made it clear that to discriminate against women for choosing to become pregnant is indisputably a violation of the PDA. *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 206, 111 S. Ct. 1196, 1207 (1991) ("Congress made clear that the decision to become pregnant or to work while being either pregnant or capable of becoming pregnant was reserved for each individual woman to make for herself.").

11

tacked on a catchall phrase" to "an emumeration of specifics," additional inclusions would be appropriate if they are sufficiently similar. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012). Given that Congress included pregnancy and childbirth and explicitly used the words "not limited to," it is a common-sense conclusion that breastfeeding is a sufficiently similar gender-specific condition covered by the broad catchall phrase included in the PDA. Breastfeeding is a gender-specific condition because it "clearly imposes upon women a burden that male employees need not—indeed, could not—suffer." *Houston Funding*, 717 F.3d at 428.

Furthermore, reading the language of the PDA to cover breastfeeding is consistent with the purpose of the PDA. The PDA was meant to clarify that the protections of Title VII "extend[ ] to the whole range of matters concerning the childbearing process," and "to include the[] physiological occurrences peculiar to women."[7] Indeed the Supreme Court has recognized that the "entire thrust" behind the PDA was "to guarantee women the basic right to participate fully and equally in the workforce, without denying them the fundamental right to full participation in family life." *Guerra*, 479 U.S. at 289, 107 S. Ct. at 693–94 (internal quotation marks omitted); *see also Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 204,

---

[7] H.R. Rep. No. 95-948, at 5 (1978); S. Rep. No. 95-331, at 4 (1977).

12

111 S. Ct. 1196, 1206 (1991) (The PDA provides that "women as capable of doing their jobs as their male counterparts may not be forced to choose between having a child and having a job."). We have little trouble concluding that Congress intended the PDA to include physiological conditions post-pregnancy. The PDA would be rendered a nullity if women were protected during a pregnancy but then could be readily terminated for breastfeeding—an important pregnancy-related[8] "physiological process." *See Houston-Funding*, 717 F.3d at 428.[9]

Our conclusion is not meant to displace the abundance of case law ruling that employers do not have to provide *special* accommodations to breastfeeding workers. The Fifth Circuit and many district courts have held that employers are not required to provide special accommodations for breast-feeding employees. *See Houston Funding*, 717 F.3d at 430 (Jones, J., concurring) ("The panel opinion does not cast doubt on the holdings of those cases rejecting . . . claims [of women who wanted to use a breast pump at work]" and that, "if [ the plaintiff] intended to request special facilities or down time during work to pump or 'express' breast milk, she would not have a claim under Title VII or the PDA.").

---

[8] The American medical community overwhelmingly recommends breastfeeding. *See, e.g.*, Am. Acad. of Pediatrics, *Policy Statement: Breastfeeding and the Use of Human Milk*, 129 Pediatrics e827 (2016), http://pediatrics.aappublications.org/content/pediatrics/early/2012/02/22/peds.2011-3552.full.pdf.

[9] Indeed we find a narrow reading of the PDA to limit pregnancy discrimination claims to those that are based on actions that occurred during the pregnancy deeply problematic. This would provide employers with a liability loophole because they could simply "wait until after the employee gives birth and then terminate her some time later." *Jacobson v. Regent Assisted Living, Inc.*, No. CV–98–564–ST, 1999 WL 373790, at *10 (D. Or. Apr. 9, 1999).

13

The line between discrimination and accommodation is a fine one. Taking adverse actions based on woman's breastfeeding is prohibited by the PDA but employers are not required to give special accommodations to breastfeeding mothers. Hicks's case presents a scenario that appears to straddle that line. While the City may not have been required to provide Hicks with *special* accommodations for breastfeeding, the jury found that the City's action in refusing an accommodation afforded to other employees compelled Hicks to resign. In the eyes of a jury, this constituted a constructive discharge, which is effectively an adverse action. *See Green*, 136 S. Ct. at 1777 (holding that under Title VII, constructive discharge is "tantamount" to actual discharge). Phrasing Hicks's claim as merely a request for special accommodation is misleading. Hicks was not asking for a *special* accommodation, or more than equal treatment—she was asking to be treated the same as "other persons not so affected but similar in their ability or inability to work" as required by the PDA. 42 U.S.C. § 2000e(k). Hicks showed that other employees with temporary injuries were given "alternative duty," and she merely requested to be granted the same alternative duty.

Recently, in *Young v. United Parcel Service, Inc.*, the Supreme Court said an employee can show discrimination if she is a member of a protected class, requested an accommodation, and her employer denied the accommodation but granted the accommodation to others similarly situated. *See* 575 U.S. ___, ___,

14

135 S. Ct. at 1338, 1354 (2015). *Young* allowed for a Title VII claim when an employer failed to accommodate a pregnant woman but accommodated "other persons not so affected but similar in their ability or inability to work." *See* 42 U.S.C. § 2000e(k). While the plaintiff in *Young* was not seeking a breastfeeding accommodation, but rather a pregnancy accommodation when she could not lift weight, the Supreme Court's logic applies equally to this case, given that breastfeeding is a similar gender-specific condition covered by the PDA.

The jury found that a reasonable person in Hicks's position would have felt compelled to resign. We see no reason to overrule the jury. In this case, the denial of accommodations for a breastfeeding employee violated the PDA when it amounted to a constructive discharge.

## V.     Other Arguments

The City also argues the Hicks failed to mitigate her damages and the district court erroneously instructed the jury. We find both arguments unavailing.

The City claims that Hicks failed to mitigate her damages when she failed to seek another full-time job. "While the injured victim has a duty to mitigate damages by being reasonably diligent in seeking substantially equivalent employment, the burden of proving lack of diligence is on the employer." *EEOC v. Massey Yardley Chrysler Plymouth, Inc.*, 117 F.3d 1244, 1251–52 (11th Cir. 1997). Hicks did work multiple other jobs (as a fitness instructor, cleaning houses,

15

and taking photographs for friends), and the city failed to meet its burden to show suitable work was available and Hicks failed to seek the work.

The City also argues that the district court erroneously instructed the jury when it denied the City's requests to include the word "each," and instead used the phrase "you may consider whether you believe the reasons." The City argues that Hicks should have been required to rebut each of the City's proffered reasons for Hicks' reassignment. We review a district court's refusal to give a particular jury instruction for abuse of discretion. *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006). Refusal to give a requested instruction is reversible error when the instruction: (1) was a correct statement of the law; (2) was not substantially covered by the instruction the court actually gave; and (3) dealt with some aspect of the trial so important that the court's failure to instruct "seriously impaired the defendant's ability to present his defense." *See United States v. Dohan*, 508 F.3d 989, 993 (11th Cir. 2007) (per curiam) (internal quotation marks omitted). The requested phrase "each reason" was substantially covered by the district court's use of the phrase "the reasons." All of the City's other arguments regarding jury instructions fail because they did not "seriously impair[] the [City's] ability to present [its] defense." *See id.*

## VI.    Conclusion

A jury decided that Stephanie Hicks suffered discrimination in violation of the PDA, and retaliation, in violation of FMLA, when she was reassigned only eight days after returning from FMLA leave following childbirth.  The jury also found that the City's failure to accommodate Hicks's accommodation requests, when it allowed accommodations to others similarly situated, constituted discriminatory constructive discharge, in violation of the PDA.  We find that a plain reading of the PDA covers discrimination against breastfeeding mothers. This holding is consistent with the purpose of PDA and will help guarantee women the right to be free from discrimination in the workplace based on gender-specific physiological occurrences.

**AFFIRMED.**

17